UNITED STATES of America, Plaintiff,

v.

George ANDERSON, Defendant.

No. CV–75–1–HG.

United States District Court,
D. Montana.

Oct. 7, 1977.

Thomas A. Olson, U. S. Atty., Billings, Mont., for plaintiff.

Dennis A. Dellwo, Dellwo, Rudolf & Schroeder, Spokane, Wash., for purpose of filing amicus curiae brief on behalf of Fort Peck Indian Tribes, only.

John C. Sheehy, Billings, Mont., for defendant.

## MEMORANDUM AND ORDER

BATTIN, District Judge.

On January 6, 1975, the United States filed this suit praying that the defendant be adjudged delinquent in his income taxes in the amount of $139,999.87,[1] including penal-

---

1. The annual assessments claimed are as follows:

| Year | Amount of Income Tax Assessed | Amount of Penalties Assessed * | Amount of Interest Assessed | Outstanding** Balance |
|---|---|---|---|---|
| 1960 | $10,525.31 | $2,734.42 | $4,886.63 | $ 17,457.46 |
| 1961 | 7,879.77 | 2,046.58 | 3,185.58 | 13,195.95 |
| 1962 | 12,694.99 | 3,298.44 | 4,370.55 | 20,527.71 |
| 1963 | 9,849.67 | 2,556.32 | 2,800.00 | 15,317.73 |
| 1964 | 2,030.75 | 525.41 | 455.44 | 3,130.30 |
| 1965 | 21,476.11 | 5,581.20 | 3,527.96 | 31,460.26 |
| 1966 | 27,742.16 | 7,208.90 | 2,892.78 | 38,910.46 |
| | | | TOTAL | $139,999.87 |

\* Includes penalties assessed under Sections 6651 and 6654, Internal Revenue Code of 1954.

\*\* Includes accrued interest to March 10, 1972.

The defendant's liability as of June 30, 1975, was $163,713.31, with interest accruing at the rate of $25.56 per day.

ty and interest, and that certain tax liens filed against the defendant's property be declared valid. The Government also asked that this Court foreclose upon said liens, and that judgment be granted to the Government for any deficiency. The defendant has moved for summary judgment on the ground that the taxes in question were assessed on income which was derived from ranching activities conducted exclusively on Indian lands, and which was thus exempt from tax. This Court has jurisdiction under 28 U.S.C. §§ 1340, 1345.

The Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation moved to intervene as a party defendant under Federal Rules of Civil Procedure, Rule 24. This motion was denied by Memorandum and Order dated February 13, 1976.

The defendant is a non-competent[2] Sioux Indian enrolled as a member of the Fort Peck Tribes. He derives his income from the raising of cattle. He is beneficial owner as allottee of a tract composed of 316.24 acres of restricted trust land. In addition, the defendant is grantee by deed of the beneficial ownership of some 320.4 acres of land originally allotted to another Indian. The Government concedes exemption as to the income from these tracts.

The defendant is the holder of a grazing permit allowing him to graze cattle on Range Unit No. 122, which is composed of 4,160 acres of land beneficially owned by some 17 different Indian allottees, and of 640 acres beneficially owned by the Tribe. All of this land is held in trust by the United States for the use and benefit of the allottees or the Tribe.

Pursuant to an order of this Court, the parties have submitted a memorandum of the status of this case. They agree that should this motion for summary judgment be granted, no further action of the Court would be required, barring a successful appeal and remand. However, if this motion is denied, the parties agree that discovery and trial will be necessary to determine the extent of the defendant's tax liability.

The question for decision here is whether the income of a non-competent Indian, derived solely from the grazing of cattle on a range unit composed of individually allotted and communally held tribal lands, is subject to the federal income tax. Counsel for the respective parties have cited no cases in this jurisdiction, and the Court's research has revealed none, in which this precise question has been decided.[3] The Court therefore treats the case as one of first impression.

In considering the question raised here, an understanding of the historical basis of present federal Indian land use policies is helpful. Such understanding must begin with the Allotment Act of 1887, 24 Stat. 388, codified at 25 U.S.C. § 331, et seq. This Act was passed pursuant to the commonly held opinion at the time that the main obstacle to solution of the "Indian problem" was the Indian tradition of communal ownership of realty. See M. Price, Law and the American Indian, 531–541 (1973). Reservation lands were parceled

2. The term "non-competent" denotes an inability to alienate trust lands without the consent of the Government. It has nothing to do with mental capacity. See, *Stevens v. Commissioner of Internal Revenue*, 452 F.2d 741, 742 (9th Cir. 1971).

3. The Government offers the recent Ninth Circuit case of *Fry v. United States*, 557 F.2d 646 (9th Cir. 1977), as being "directly on point." The Court finds the case to be distinguishable. In *Fry*, the taxpayer was hired as a subcontractor to conduct logging operations on the reservation for a non-Indian logging company. The Court of Appeals found that the income there in question was not derived directly from tribal

or allotted lands, but was income earned from a contract with a non-Indian logging company. In the case at bar, it cannot be seriously disputed that the income here in question was derived directly from Indian lands held in trust by the United States, and not through a contract with a middleman.

The Court also finds the cases of *Choteau v. Burnet*, 283 U.S. 691, 51 S.Ct. 598, 75 L.Ed. 1353 (1931), and *Superintendent of Five Civilized Tribes v. Commissioner of Internal Revenue*, 295 U.S. 418, 55 S.Ct. 820, 79 L.Ed. 1517 (1935), to be distinguishable from the case at bar on the grounds stated by the Supreme Court in *Squire v. Capoeman*, 351 U.S. 1, 9–10, 76 S.Ct. 611, 100 L.Ed. 883 (1956).

out to each enrolled tribal member, who was to be supplied by the Government with the physical and intellectual wherewithal to cultivate the land. Title to the land was to be held by the United States as trustee for the allottee for a period of time sufficient to allow him to become accustomed to the white man's ways, after which time the allottee would become owner of the fee. The Act also provided a means by which unallotted reservation land could be acquired by the United States, which would in turn make it available to non-Indian homesteaders. 25 U.S.C. § 348.

The results of this policy of partition and distribution were disastrous. One particular. problem was raised by the provisions of § 348 regarding descent and distribution. Allotted lands were specifically made subject to the laws of intestate succession of the state or territory in which the land was located. As a result, after two or three generations of subdivision through heirship, the descendants of the original allottee were left with individual parcels of land which were simply too small to cultivate or graze effectively. See M. Price, Law and the American Indian, 646–649 (1973), and authorities cited therein.

In 1934, the Indian Reorganization Act, 48 Stat. 984, 25 U.S.C. §§ 461, et seq., was passed to remedy this problem. It terminated the allotment policy, 25 U.S.C. § 461, and provided a means by which the reservations could rebuild their land bases through purchase of contiguous lands with federal funds. 25 U.S.C. § 465. It further provided that tribes could, through adoption of a constitution and by-laws, establish themselves as corporate political entities. 25 U.S.C. § 476. Most important for purposes of this case, the Reorganization Act authorized the Secretary of the Interior to promulgate rules and regulations to promote optimum use of Indian land resources. 25 U.S.C. § 466.

The regulations, codified at 25 C.F.R. §§ 151.1, et seq., provide for consolidation of the allotments of certain allottees into grazing units such as the one utilized by the defendant in the case at bar. The objectives of these regulations are significant:

It is the purpose of the regulations in this part to:

. . . . .

(b) Promote use of the range resource by Indians to enable them to earn a living, in whole or in part, through the grazing of their own livestock.

(c) Provide for administration of grazing privileges in a manner which will yield the highest return consistent with sustained yield land management principles and the fulfilling of the rights and objectives of tribal governing bodies and individual land owners.

25 C.F.R. § 151.3.

■ The question before the Court must be considered against this statutory and regulatory backdrop, for Courts have consistently recognized that the question of Indian taxation does not begin and end with the language of the taxing statute. *Squire v. Capoeman*, 351 U.S. 1, 6, 76 S.Ct. 611, 100 L.Ed. 883 (1956); see *Choteau v. Burnet*, 283 U.S. 691, 696, 51 S.Ct. 598, 75 L.Ed. 1353 (1931). Rather, consideration of relevant treaties, statutes, and other expressions of federal policy are required.

In *Squire*, the Supreme Court handed down its most. significant decision on the federal tax status of Indian allottees. The question before the Court was whether a non-competent Indian could be taxed on income derived from the sale of timber grown on his allotted land. The Court recognized the broad general applicability of tax statutes, and the general rule that exemptions from such statutes must be clearly expressed, but stated "[w]e cannot agree that taxability of respondents is unaffected by the treaty, the trust patent or the Allotment Act." 351 U.S. at 1, 76 S.Ct. at 614. After an examination of this relevant background, the Court concluded that the income in question was tax exempt, based on the guarantee in 25 U.S.C. § 348 that allotted land would eventually be conveyed to the allottee or his heirs "in fee . . .

free of all charge or incumbrance whatsoever . . .."[4]

The Court does not find this case to be within the specific holding of *Squire;* the cases are clearly distinguishable on grounds that the defendant here is not an allottee of the land of which the grazing unit is composed. However, the Court is convinced that a full effectuation of federal Indian land use policies requires that income derived from grazing units be free from tax.

The inefficient use of Indian lands under the Allotment Act was one of the major concerns of Congress in enacting subsequent legislation. This concern is reflected in the heavy emphasis on land use in the Reorganization Act and in the regulations promulgated thereunder by the Secretary of the Interior. It is clear that the federal government, specifically the Congress and the Department of the Interior, are most concerned about promoting optimum Indian land use and eventual economic independence.

In *Squire*, the Supreme Court recognized that income tax laws ought not to be construed so as to impede the accomplishment of federal objectives in the area of Indian land use. 351 U.S. at 10, 76 S.Ct. 611. The concerns expressed in that case, that the proceeds of the sale of timber from allotted lands must of necessity be tax exempt if the allottee is to achieve economic independence, are equally applicable in the case at bar. In many cases, individual allotments of land are simply too small to be grazed efficiently. In addition, the individual allottees whose land may comprise a grazing unit are general unable to work the land.[5] If efficient use is to be made of grazing land, which may be arid and ill-suited for cultivation, it is clear that Indian ranchers must have easy access to grazing units.

As the Court noted in *Squire*, "[i]t is unreasonable to infer that, in enacting the income tax law, Congress intended to limit or undermine the government's undertaking." 351 U.S. at 10, 76 S.Ct. at 617. The Court will not draw such an inference in this case. The taxation of income from grazing permits impedes the achievement of the Government's land use objectives. The Court therefore concludes that such income is tax exempt.

In reaching this conclusion, the Court is not unmindful of the fact that it has contravened such precedent as there is from other jurisdictions. See *Holt v. Commissioner of Internal Revenue*, 364 F.2d 38 (8th Cir. 1966); *Bryan L. Stevens*, 52 T.C. 330 (1969), aff'd on other grounds *sub nom. Stevens v. Commissioner of Internal Revenue*, 452 F.2d 741 (9th Cir. 1971).[6] How-

4. The Court found that Congress in all probability intended such income to be tax exempt, and that in any event that result was required by the guarantee against conveyance of incumbered land. In reaching this conclusion, the Court relied on the principle, first enunciated in *Worcester v. Georgia*, 6 Pet. (31 U.S.) 515, 8 L.Ed. 483 (1832), that treaties and statutes dealing with Indians are to be construed most strongly in favor of the Indians. 351 U.S. at 6–7, 76 S.Ct. 611.

5. 10 C.F.R. § 151.9 describes the types of allottees whose land may be included in a grazing unit:

(a) The Superintendent may include individually owned land in grazing permits on behalf of: (1) Orphaned minors; (2) persons who are non compos mentis and without legal guardians; (3) undetermined heirs or devisees of a deceased Indian owner; (4) adults whose whereabouts are unknown; (5) heirs or devisees, none of whom are using the land and who have been unable to agree upon the permitting of their land . . .; (6) those Indian land owners . . . who give the Superintendent written authority to grant grazing privileges; and (7) any other Indian minor or person who is non compos mentis or otherwise under legal disability, if that person's guardian . . . gives the Superintendent written authority to grant grazing privileges.

6. In *Stevens*, the Ninth Circuit considered the taxability of income derived from lands originally allotted to another Indian and acquired by the taxpayer through descent or conveyance. The Court found the holding in *Squire* to be neither narrow nor technical, 452 F.2d at 744, and concluded that allotted land is subject to tax only after a patent in fee is issued. The issue of income from activities on grazing units was decided adversely to the taxpayer by the Tax Court; this determination was not appealed. 452 F.2d at 743.

14

ever, these cases ignore the large issues of policy which mandate the Court's decision in the case at bar. If the United States is to live up to its guardianship status, as it attempts to with its land use policies, the conclusion reached by the Court is a necessary one. Therefore,

IT IS ORDERED that the defendant's motion for summary judgment be, and the same hereby is, granted.

IT IS FURTHER ORDERED that the plaintiff remove or release any lien, levy, or other incumbrance against the defendant or his property as a result of any claimed tax on income derived by the defendant from a grazing permit on tribal and/or allotted lands.

The Clerk is directed to enter a final judgment, by separate document, consistent with this Memorandum and Order.