**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**George ANDERSON, Defendant-Appellee.**

**No. 78–1114.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 22, 1980.

Decided Aug. 21, 1980.

Rehearing Denied Oct. 27, 1980.

Ferguson, Circuit Judge, dissented and filed opinion.

---

Aaron Phillip Rosenfeld, Washington, D. C., for plaintiff-appellant.

John Sheehy, Billings, Mont., Arthur Lazarus, Jr., Washington, D. C., on brief; Terry Grant, Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., for defendant-appellee.

Before CHOY and FERGUSON, Circuit Judges, and BARTELS,* District Judge.

CHOY, Circuit Judge:

The Government appeals from the district court's summary judgment holding that the income a noncompetent Indian derives from cattle ranching, under a tribal license, on land held in trust by the United States for other Indians and for the tribe is not subject to federal income taxation. We reverse.

I. *Background*

Congress enacted the General Allotment Act of 1887, ch. 119, 24 Stat. 388, 25 U.S.C. § 331 *et seq.*, to conform Indian land ownership to the individual property ownership system existing in the United States. The United States divided reservations into uniform parcels and held one such "allotment" in trust for each individual Indian and his heirs. The General Allotment Act failed to assimilate Indians by making them yeomen, as was originally intended. Allotments could not be pledged for credit, and when original allottees died each of their heirs received in trust a parcel so small that it could not be efficiently grazed or farmed.

The General Allotment Act provided that at the end of the statutory trust period (subject to extension), Indian allottees were to receive their lands "in fee, discharged of said trust and free of all charge or incumbrance whatsoever," and that then "all restrictions as to sale, incumbrance, or taxation of said land shall be removed." §§ 5, 6, 25 U.S.C. §§ 348, 349. The courts have construed this language to exempt from federal taxation the land held in trust for an Indian and the income that the Indian derives from it. *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956); *Stevens v. Commissioner,* 452 F.2d 741 (9th Cir. 1971).

In 1934 Congress abandoned the General Allotment Act's emphasis on individual ownership and passed the Indian Reorganization Act of 1934, ch. 576, 48 Stat. 984, 25 U.S.C. §§ 461–479 [hereafter "IRA"]. The Government was authorized and encouraged to acquire land in trust for the tribes, and tribal constitutions, councils and corporations were authorized. IRA §§ 5, 16, 17; 25 U.S.C. §§ 465, 476, 477. The Secretary of the Interior was authorized to make regulations to facilitate optimal use of reservation land. IRA § 6, 25 U.S.C. § 466.

Like many other tribes, the Fort Peck Tribes adopted a land-use program based on the principle of consolidation of parcels for efficient use. The Fort Peck Tribal Executive Board, under the supervision of the Bureau of Indian Affairs, markets the right to graze cattle on the trust land held by the United States for the tribe itself, for Indians unable to use the land themselves (orphaned minors, missing persons, etc.) and for any other allottees willing to participate. The Executive Board, with the Bureau's supervision, establishes grazing regulations and combines these parcels into suitably large grazing "units"; then the Bureau and the Executive Board sell licenses to graze cattle on the units to ranchers for a term of years.[1] Preference is given to Indian ranchers. The proceeds from the sale of licenses are distributed ratably to the equitable "landowners."

Anderson, a "noncompetent"[2] Sioux member of the Fort Peck Tribes, is a cattle rancher. His headquarters are on his own allotted land, but he grazes his cattle, under tribal license, on a land-use program "unit" consisting of parcels held in trust by the United States for several noncompetent Indians (but not for Anderson) and for the

---

* The Honorable John R. Bartels, Senior United States District Judge for the Eastern District of New York, sitting by designation.

1. In addition to this involvement in the land-consolidation and licensing program, the federal government makes substantial expenditures to aid productive land use on the Fort Peck Reservation.

2. By the terms of the trust under which the United States holds Anderson's allotted land, he is "noncompetent" to alienate it without the United States' permission. The term "noncompetent" in no way implies that Anderson is *non compos mentis. Stevens v. Commissioner,* 452 F.2d 741, 742 n.1 (9th Cir. 1971).

Tribes. The Government concedes that Anderson's income, if any, allocable to his own allotted land is tax-free, but seeks to collect taxes on his income, if any, allocable to the grazing unit.[3]

The district court below, relying on the regulations under IRA § 6, 25 U.S.C. § 466, held on summary judgment that the federal policies of promoting optimal land use on Indian reservations and eventual Indian economic independence precluded all taxation of the income Anderson derived from the licensed grazing unit. *United States v. Anderson*, 442 F.Supp. 10, 13 (D.Mont.1977).

II. *Analysis*

■ Despite our sympathy for Anderson and similarly situated Indians, we must reverse the district court. Other courts have held, and we are forced to agree, that a noncompetent Indian's income allocable to cattle grazing on others' trust land is taxable. *Holt v. Commissioner*, 44 T.C. 686 (1965), *aff'd*, 364 F.2d 38 (8th Cir. 1966), *cert. denied*, 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967); *Stevens v. Commissioner*, 52 T.C. 330 (1969);[4] *see also Strom v. Commissioner*, 6 T.C. 621 (1946), *aff'd*, 158 F.2d 520 (9th Cir. 1947).

A. *The Requirement of an Explicit Exemption*

By its terms, the federal income tax applies to "every individual" and "all income from whatever source derived." I.R.C. §§ 1, 61. "Indians are subject to payment of federal income taxes, as are other citizens, unless an exemption from taxation

can be found in the language of a Treaty or Act of Congress." *Commissioner v. Walker*, 326 F.2d 261, 263 (9th Cir. 1964).

■ The rule that ambiguous statutes and treaties are to be construed in favor of Indians applies to tax exemptions, *Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912); *see, e. g., Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956) (construing General Allotment Act §§ 5–6 to create exemption from not-yet-created federal income tax), but this rule "comes into play only if such statute or treaty contains language which can reasonably be construed to confer income [tax] exemptions." *Holt v. Commissioner*, 364 F.2d 38, 40 (8th Cir. 1966) (before panel including Blackmun, J.), *cert. denied*, 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967). "The intent to exclude must be definitely expressed, where, as here, the general language of the Act laying the tax is broad enough to include the subject matter." *Choteau v. Burnet*, 283 U.S. 691, 696, 51 S.Ct. 598, 601, 75 L.Ed. 1353 (1931).

We could uphold the district court's summary judgment for Anderson only if we could find express exemptive language in some statute or treaty. Anderson and the amici direct our attention to the General Allotment Act and the IRA, but we find nothing there to support Anderson's position.

1. *The General Allotment Act of 1887*

The only provisions of the Act[5] that could support Anderson are those involved

---

3. A noncompetent Indian's income from "non-land-based" businesses conducted on his trust land is taxable; for example, income from a law practice would be taxable, whereas income from mining or agriculture would not be. *See Critzer v. United States*, 597 F.2d 708 (Ct.Cl.), *cert. denied*, 444 L.Ed.2d 920, 100 S.Ct. 239, 62 L.Ed. 176 (1979) (income from motel/restaurant/gift shop on possessory holding—similar to an allotment—is taxable, at least in part, because derived primarily from personal investment and services rather than from the land itself). However, the IRS has conceded that income obtained from grazing one's own cattle on one's own trust allotment, or from licensing or leasing grazing rights to another, is

obtained "directly" from the land and is tax-free. Rev.Rul. 56–342, 1956–2 C.B. 20; Rev. Rul. 62–16, 1962–1 C.B. 7.

4. The question of Stevens' taxability on income derived from grazing cattle on land held in trust for other Indians and for his tribe was not appealed to this Court, and thus was not decided in our *Stevens v. Commissioner*, 452 F.2d 741.

5. The allotment provisions of the General Allotment Act would overbear those of the 1888 treaty with the Fort Peck Tribes if the latter were more unfavorable to the Indians, because the acts must be construed *in pari materia*.

in *Capoeman* : sections 5 and 6, 25 U.S.C. §§ 348, 349. Section 5 declared that the Secretary of the Interior shall issue patents to allottees saying that the United States will hold the land "in trust for the sole use and benefit" of the named Indian for 25 years (plus any period of extension), "and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs as aforesaid, in fee, discharged of said trust and *free of all charge or incumbrance whatsoever*" (emphasis added).

Section 6 declared that at the expiration of the trust period, or when the Secretary of Interior is sooner satisfied that the Indian is competent, an allottee shall be issued a patent in fee simple, "and thereafter all *restrictions as to* sale, *incumbrance, or taxation* of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent" (emphasis added).

In *Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956), the Supreme Court construed these sections to create an express tax exemption for an Indian deriving income directly from his own trust allotment.[6]

What distinguishes Anderson's case from *Capoeman* is that there "the income which was held to be exempt to the allottee was from operations conducted *on his own allotted land.*" *Fry v. United States*, 557 F.2d 646, 648 (9th Cir. 1977) (emphasis in original), *cert. denied*, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978). In *Fry*, we held that a noncompetent Indian engaged, as a

subcontractor to a non-Indian company, in logging on tribal trust land was taxable. There, we recognized that *Capoeman*'s point was that if an Indian's allotted land (or the income directly derived from it) was taxed, and the tax was not paid, the resulting tax lien on the land would make it impossible for him to receive the land free of "incumbrance" at the end of the trust period. The purpose of §§ 5 and 6 was "to provide the allottee with unencumbered land when he became competent. [Citation] It was not to benefit him simply because he was an Indian, or to benefit Indians generally." *Id.* at 649 (footnotes omitted). By contrast, "taxation of the taxpayer's individual profit derived from his lease of tribal [or other allottees' trust] land cannot possibly represent a burden or encumbrance upon the tribe's [or other allottees'] interest in such land." *Holt v. Commissioner*, 364 F.2d at 41.

■ Therefore, the General Allotment Act provides no tax exemption for the income a noncompetent Indian derives from *other* Indians', or his tribe's, trust land.

It is argued that we should give a broader meaning to the word "incumbrance," and recognize that taxation of Anderson "encumbers" the interest of the noncompetent Indians whose land he uses under land-use program licenses. If the use of the land subjects Anderson to federal income tax, the right to use it is worth less to him, and he will probably not be willing to pay as high a license fee as he otherwise would. Therefore, federal taxation of Anderson

---

See *Stevens v. Commissioner*, 452 F.2d at 744, 746; *Kirkwood v. Arenas*, 243 F.2d 863, 867 (9th Cir. 1957). For the same reason, the provisions of the General Allotment Act relating to land held in trust for individual Indians also apply to land held in trust for tribes under the IRA. See *Stevens v. Commissioner*, 452 F.2d at 745–46.

6. The Supreme Court noted that the purpose of the General Allotment Act was to bring Indians to the point where they could compete with whites in the economic world. Therefore the Government should not be allowed to tax Capoeman's timber sales; after logging off, his land would be worthless, and could no longer "serve the purpose of bringing him finally to a

state of competency and independence. Unless the proceeds of the timber sale are preserved for respondent, he cannot go forward when declared competent with the necessary chance of economic survival in competition with others." 351 U.S. at 10, 76 S.Ct. at 617.

Anderson's reliance on this passage is misplaced. *Capoeman* and every other Supreme Court and Ninth Circuit case have held that such policy arguments are fruitless in the absence of statutory or treaty language that arguably is an express tax exemption. Such policy arguments, however, might persuade courts to construe such arguable language, if any exists, actually to be an express tax exemption.

theoretically reduces the (tax-free) licensing income of other noncompetent Indians. *See Agua Caliente Band of Mission Indians v. County of Riverside*, 442 F.2d 1184, 1186 (9th Cir. 1971), *cert. denied*, 405 U.S. 933, 92 S.Ct. 930, 30 L.Ed.2d 809 (1972).

▮ Nonetheless, this effect is not a General Allotment Act "incumbrance." Federal taxation of a (non-Indian) lessee of tribal trust land is permissible even if it has a "perceptible economic effect" on the tribe. *Heiner v. Colonial Trust Co.*, 275 U.S. 232, 234–35, 48 S.Ct. 65, 66, 72 L.Ed. 256 (1927). We were not deterred by this argument when, in *Fry*, we upheld federal taxation of a noncompetent Indian subcontractor engaged in logging on tribal trust land.[7] 557 F.2d at 649 n.7.

### 2. Indian Reorganization Act § 5

Section 5 of the IRA, 48 Stat. 985 [25 U.S.C. § 465], reads in pertinent part, "Title to any lands or rights acquired pursuant to this Act shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be *exempt from State and local taxation*" (emphasis added).

This language obviously negatives any Congressional intent to create an exemption from federal tax, particularly in light of language in a predecessor bill that would have forbidden all "taxation" of trust land. *See* S. 2755, H.R. 7902, 73rd Cong., 2d Sess. § 16 (1934).[8]

The amici claim that noncompetent Indians were not considered federally taxable in 1934; therefore, they contend that we should ignore the rule of *inclusio unius est exclusio alterius* and read IRA § 5 to create a federal tax exemption. In fact, the Board of Tax Appeals held on December 26, 1933, that a noncompetent Indian's rein-

vestment income was federally taxable. *Superintendent v. Commissioner*, 29 B.T.A. 635 (1933), *aff'd*, 75 F.2d 183 (10th Cir.), *aff'd*, 295 U.S. 418, 55 S.Ct. 650 (1935).

▮ Finally, the Supreme Court has held that, even as to state and local taxes, IRA § 5 provides an exemption only from property taxes, not from income taxes. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 155–58, 93 S.Ct. 1267, 1274–75, 36 L.Ed.2d 114 (1973). Thus § 5 is hardly an exemption from federal income taxation.

### 3. Indian Reorganization Act § 6

▮ The General Allotment Act was in no way an undertaking by the Government to manage the land resources of Indian reservations for the optimum economic benefit of the Indians. *See United States v. Mitchell*, —— U.S. ——, ——, 100 S.Ct. 1349, 1354–55, 63 L.Ed.2d 607 (1980). On the other hand, the IRA did involve such an undertaking. IRA § 6, 25 U.S.C. § 466, reads:

> The *Secretary of the Interior is directed to make rules and regulations* for the operation and management of Indian forestry units on the principle of sustained-yield management, to restrict the number of *livestock grazed* on Indian range units to the estimated carrying capacity of such ranges, and to *promulgate such other rules and regulations* as may be necessary to protect the range from deterioration, to prevent soil erosion, *to assure full utilization of the range, and like purposes*.

(Emphasis added.) Under this statute, Interior has promulgated the regulations underlying the Fort Peck Tribe's land-use program.

▮ It is obvious that § 6 is not, on its face, an express tax exemption. Interior has not attempted to use § 6 to promulgate a regulation exempting Indians such as An-

---

7. If taxation of licensees was, on this theory, an "incumbrance," enforcement of antitrust, pure food, safety and health, etc., laws against licensees would similarly constitute impermissible "incumbrances."

8. Interior's representations to certain tribes regarding the tax exemption of the predecessor bill do not, of course, constitute an administrative interpretation of the bill as finally passed or estop the Commissioner from now asserting that the very different language of IRA § 5 has a more limited effect.

derson from tax, so we need not decide what effect such an attempt would have. All § 6 and the promulgated regulations bring to this case is a federal *policy* in favor of efficient land use on Indian reservations, a policy hindered by the result we reach today. *See* Part II.B, *infra.*

### 4. *Indian Reorganization Act § 16*

IRA § 16, 25 U.S.C. 476, provides that any tribe (which voted to come under the IRA) may adopt a constitution, which "shall also vest in such tribe or its tribal council" the right and power "to *prevent* the sale, disposition, lease, or *encumbrance* of tribal lands, interests in lands, or other tribal assets without the consent of the tribe" (emphasis added). It is asserted that because the Tribes have not consented to federal taxation of the licensee of their trust lands, such taxation is an illegal "encumbrance."

Even if this argument were valid, it would not benefit Anderson, for IRA § 16 does not apply to the Fort Peck Tribes. Congress explicitly commanded in IRA § 18, 48 Stat. 988 [25 U.S.C. § 478], that:

> This Act shall not apply to any reservation wherein a majority of the adult Indians, voting at a special election duly called by the Secretary of the Interior, shall vote against its application. It shall be the duty of the Secretary of the Interior, within one year [later extended to two years] after the passage and approval of this Act, to call such an election, which election shall be held by secret ballot upon thirty days' notice.

The Fort Peck Tribes voted against the Act. Many years later, they recanted; they adopted a tribal constitution in 1960, and have since behaved and been treated by Interior exactly as if they were IRA tribes. Nonetheless, the explicit language of § 18 does *not disappear from our view* simply because Interior chooses to wink. If the Tribes wish to be relieved from the effects of their negative vote, they must seek such relief from Congress.

**9.** The language of 25 U.S.C. § 478, the codified version of § 18, is inconsistent with our holding

A three-judge district court concluded that the election requirement of § 18 was intended to affect only §§ 16 and 17, 25 U.S.C. §§ 476, 477, and that a vote against the IRA would not affect the applicability to the tribe of the remainder of the IRA. *Mancari v. Morton,* 359 F.Supp. 585, 588 (D.N.M.1973), *rev'd on other grounds,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). We agree.[9] Thus, the Fort Peck Tribes' vote against the IRA precludes the application of § 16 here, even if that section created a federal tax exemption.

■ However, even if § 16 were available to the Fort Peck Tribes, it would not promote Anderson's cause. *See Fort Mojave Tribe v. County of San Bernardino,* 543 F.2d 1253, 1256 (9th Cir. 1976) (516 does not preclude state taxation of leasehold of tribal land), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1977). The word "encumbrance," read in context and *in pari materia* with General Allotment Act § 5, *see Stevens v. Commissioner,* 452 F.2d at 746, refers only to a tribe's power to prevent the unconsented encumbrance of its land interests by removing from its agents and members the legal authority to alienate or cloud, without official tribal consent, its equitable title to its trust land. Moreover, no provision in a tribal constitution could limit the taxing power of the United States, a superior sovereign, any more than such a provision in a state constitution could.

### B. *The Insufficiency of Policy Alone*

■ In the absence of express exemptive language, it was error for the district court to create for Indians a federal tax exemption based on policy alone.

> [I]t is one thing to say that courts should construe treaties and statutes dealing with Indians liberally, and quite another to say that, based on those same policy considerations which prompted the canon of liberal construction, courts themselves are free to create favorable rules. . .

and should be disregarded.

Congress is the body which grants tax exemptions. . . . ". . . [T]ax exemptions are not granted by implication."

*Fry v. United States*, 557 F.2d at 649.

If federal courts were free to create federal tax exemptions for Indians based on policy alone, the federal policy of Indian economic advancement, implicit in almost all of the many federal enactments regarding Indians,[10] would soon have the unintended effect of exempting all Indians from all federal taxation. Nor is any other policy sought to be promoted by the IRA sufficient to defeat explicit taxing language. We have held that, in the absence of any express tax exemption, the noncompetent treasurer of a tribal council, a key officer of a body essential to the purposes of the IRA, is taxable on his salary even though the funds that paid his salary were derived directly from tribal trust lands, and even though such taxation lessened the attractiveness of the office. *Commissioner v. Walker*, 326 F.2d at 261.

 We hold that policy can create no federal income tax exemption when unaccompanied by express exempting language in a statute or treaty. Anderson must address his policy arguments to Congress, not to the courts.[11]

#### C. *Equal Protection*

Anderson contends that if we decide the federal income tax applies to him, we should declare the tax unconstitutional as applied for violating the equal protection component of the Fifth Amendment's due process clause.

The classes Anderson says are treated differently are (1) noncompetent Indians who buy the equitable fee to land held in trust for others (nontaxable, under *Stevens*), and (2) noncompetent Indians who

buy licenses to use land held in trust for others (taxable). Also, says Anderson, the Government treats differently (1) noncompetent Indians who derive income from their own trust land (nontaxable, under *Capoeman*), and (2) noncompetent Indians who derive income from land held in trust for others (taxable).

These are not suspect classifications, and no fundamental interest is involved. Therefore the rational relation test applies, and the classifications "will not be set aside if any state of facts rationally justifying [them] is demonstrated to or perceived by the courts." *United States v. Maryland Savings-Share Insurance Corp.*, 400 U.S. 4, 6, 91 S.Ct. 16, 17, 27 L.Ed.2d 4 (1970). Congress could rationally want to help Indians and tribes by exempting them from tax on income derived from their own trust land, but refuse to extend the additional benefit of allowing them to market the advantage of tax exemption to others while still retaining the equitable fee in the land.

 Therefore, this taxation of Anderson does not deprive him of equal protection.

#### III. *Conclusion*

The district court erred in holding that federal policy prevented the IRS from taxing the portion of Anderson's income allocable to cattle ranching on trust land licensed from other noncompetent Indians and the Tribes. Policy alone cannot support a federal tax exemption in the absence of express exemptive language in a statute or treaty. Finding no such language here, and rejecting Anderson's equal protection argument, we REVERSE the district court's summary judgment and REMAND for further proceedings.

**10.** *See, e. g.,* the special statutory rehabilitation program in *Holt,* under which the taxpayer received a loan of $10,000 worth of cattle and equipment.

**11.** When federal policy conflicts with state attempts to tax or regulate Indians, the Suprema-

cy Clause may come into play. *See, e. g., White Mountain Apache Tribe v. Bracker,* —— U.S. ——, ——, 100 S.Ct. 2578, 2587, 65 L.Ed.2d —— (1980). We deal here, however, with a conflict between federal Indian policy and an explicit federal tax statute.

FERGUSON, Circuit Judge, dissenting:

The result reached here, as the majority admits, will hinder federal policy toward the Indians. I must therefore dissent.

By adopting statutes which attempt to assist Indians in becoming economically self-sufficient, Congress intended to exempt noncompetent Indians from federal income taxation when income is derived from lands held in trust for Indians. Judge Battin was therefore correct when he held that federal policies and statutes regarding Indians created an exemption for Anderson from federal income taxation for the income derived from grazing cattle on land held in trust for other noncompetent Indians and his tribe.

The majority fails to give effect to the reason and logic of the opinion of the Supreme Court in *Squire v. Capoeman*, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). The Court found in that case that the income which came directly from the land was tax-exempt. It specifically rejected the argument that the case should be viewed as an ordinary tax case without regard to relevant treaties and statutes, congressional policy concerning Indians, or the guardian-ward relationship existing between the United States and Indians. In determining that the income at issue here was tax-exempt, Judge Battin found, as did the Supreme Court, that those matters were relevant, and that they required a holding that Anderson's income was not subject to federal taxation.

Judge Battin's decision is consistent with the proposition, stated by the Attorney General in 1924, that "[i]t is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian." 34 Op.Atty.Gen. 275, 281 (1924), *quoted in Squire v. Capoeman, supra*, 351 U.S. at 8, 76 S.Ct. at 616. It is also consistent with the following statement of the Supreme Court in *Squire v. Capoeman, supra*, 351 U.S. at 8–9, 76 S.Ct. at 616 (footnote omitted):

> [I]t was said by Felix S. Cohen, an acknowledged expert in Indian law, that "It is clear that the exemption accorded tribal and restricted Indian lands extends to the income derived directly therefrom."

The majority fails to recognize that courts must interpret federal statutes and policies in a manner which does not thwart the intent of Congress. The majority's failure to exempt Anderson's income from federal taxation does exactly that. Because I feel that *Squire v. Capoeman* and federal policies and statutes dictate that Mr. Anderson's income be tax-exempt, I must dissent.