UNITED STATES of America, Plaintiff,

v.

FERRY COUNTY and Okanogan County, Washington, Defendants.

CONFEDERATED TRIBES OF the COLVILLE INDIAN RESERVATION, Plaintiff,

v.

Ronald L. BACON et al., Defendants.

Civ. Nos. C-77-67, C-77-111.

United States District Court, E. D. Washington.

April 3, 1981.

Robert L. Pirtle, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., for plaintiff Tribes.

Robert M. Sweeney, Asst. U. S. Atty., Spokane, Wash., for plaintiff-intervenor Government.

James A. Furber, Sp. Deputy Pros. Atty., Gordon, Thomas, Honeywell, Malanca, Peterson & O'Hern, Tacoma, Wash., for defendants.

MEMORANDUM OPINION AND ORDER GRANTING MOTIONS FOR SUMMARY JUDGMENT IN PART

NATURE OF THE CASE

QUACKENBUSH, District Judge.

This is a consolidated civil action by the Confederated Tribes of the Colville Indian

Reservation and the United States against Ferry and Okanogan Counties seeking declaratory and injunctive relief concerning the tax status of certain lands within the Colville Indian Reservation acquired by the United States in trust for the Tribes and individual Indians pursuant to Sections 2 and 3 of the Act of July 24, 1956 (PL 84–772, 70 Stat. 626), the Colville Restoration Act (hereinafter referred to as "PL–772"). The State of Washington is a plaintiff-intervenor. The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1345. Since there are no triable issues of fact, all parties have moved for Summary Judgment.

. The dispute concerns the interpretation of PL–772 which provides:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the undisposed-of lands of the Colville Indian Reservation, Washington, dealt with the Act of March 22, 1906 (34 Stat. 80), are hereby restored to tribal ownership to be held in trust by the United States to the same extent as all other tribal lands on the existing reservation, subject to any existing valid rights.

Sec. 2. For the purpose of effecting land consolidations between the Colville Indians and non-Indians in Ferry and Okanogan Counties, the Secretary of the Interior is hereby authorized with the consent of the tribal council as evidenced by a resolution adopted in accordance with the constitution and bylaws of the tribe, under such regulations as he may prescribe, to sell or exchange tribal lands in connection with the acquisition of lieu lands, and to acquire through purchase, exchange or relinquishment, lands or any interest in lands, water rights, or surfact rights. The acquisition of lands pursuant to this Act shall be limited to lands within the boundary of the reservation. Exchanges of lands, including improvements thereon, shall be made on the basis of approximate equal value. In carrying out the provisions of this Act, if non-Indian lands are involved the board of county commissioners of counties in which land

is located shall by proper resolution consent before such non-Indian land is acquired for the tribe or an individual Indian. No lands or interests in lands owned by the Confederated Tribes of the Colville Reservation shall be subject to disposition hereafter without the consent of the duly authorized governing body of the tribes, and no lands or interests in lands shall be acquired for the tribes without the consent of the said governing body.

Sec. 3. Title to lands or any interest therein acquired pursuant to this Act shall be taken in the name of the United States of America in trust for the tribe or individual Indian and shall be nontaxable as other tribal and allotted trust Indian lands of the Colville Reservation.

Sec. 4. The agreement entered into by the Confederated Tribes of the Colville Reservation and Okanogan and Ferry Counties of the State of Washington on April 21, 1954, is hereby ratified and approved.

Sec. 5. The Business Counsel of the Confederated Tribes of the Colville Reservation shall, in accordance with the resolution numbered 1955–33, dated April 8, 1955, of the Colville Business Council, submit to the Secretary of the Interior within five years from the date of enactment of this Act proposed legislation providing for the termination of Federal supervision over the property and affairs of the Confederated Tribes and their members within a reasonable time after the submission of such proposed legislation. Approved July 24, 1956.

## BACKGROUND

The original Colville Indian Reservation was created by Executive Order in 1872 and consisted of 2,886,000 acres of land. In 1892 Congress restored what is referred to as the "northern half" (1,500,000) acres of the Reservation to the public domain. Act of July 1, 1892, 27 Stat. 62. Title to the balance, the 1,300,000 "diminished Colville Indian Reservation", remained in the Unit-

ed States for the use and occupancy of the Indians.

In 1906, Congress directed allotments of 80 acres each on the diminished Reservation to members of the Tribes with the opening up of the remaining "surplus" lands within the diminished reservation to entry and settlement. Act of March 22, 1906, 34 Stat. 80 (implemented by Presidential Proclamation, 1916, 39 Stat. 1778.) The result was a reduction in the Colville land base to 200,000 acres.

A major reversal of governmental policy regarding Indian affairs was effectuated by the enactment of the Indian Reorganization (Wheeler-Howard) Act of 1934 (hereinafter referred to as the I.R.A.), 25 U.S.C. § 461 *et seq.* Comment, *Tribal Self-Government and the Indian Reorganization Act of 1934,* 70 Mich.L.Rev. 955 (1972). The I.R.A. provided for the restoration of the remaining surplus lands to tribal ownership, which lands had been opened to disposal to non-Indians by the public lands laws. There were 818,000 acres of such land. The I.R.A. provided that the Act would not apply to any reservation if the Indians voted against its application. The Colville Tribes voted against application of the I.R.A. Thus, the 818,000 acres remained open to acquisition by non-Indians in which event said acquired lands would be subject to taxation by the Counties.

In 1956, at the request of the Colville Tribes, Congress enacted PL–772, the subject of this litigation, which provided for restoration of the 818,000 acres to the Tribes and authority for acquisition of ceded lands within the Colville Reservation. Generally, Section 1 of PL–772 provided that the "undisposed-of lands" (818,000) of the diminished Reservation were restored to the United States to be held in trust for the Tribes in the same manner as other trust lands were held. Section 2 sets out the manner in which the Secretary of the Interior could acquire other lands within the diminished Reservation for the benefit of the Tribes. The section provided that the county commissioners shall consent to the acquisition of non-Indian lands before such acquisition takes place. Section 3 instructs that lands taken into trust *pursuant to PL–772* are to be non-taxable. Section 4, which is not relevant to the disposition of this matter, "ratifies" a 1954 agreement between the Tribes and Okanogan and Ferry Counties.[1] Section 5 requires the Tribal Council to submit within five years of the enactment of PL–772 proposed legislation providing for the termination of federal supervision over the affairs of the Tribes.

The Okanogan County Commissioners, in 1961, gave general consent to the acquisition of lands by the United States in trust for plaintiff Tribes and individual Indians; additional general consent was given by Okanogan in 1962. In 1971 Okanogan revoked the 1961 general consent resolution and thereafter considered requests for the acquisition of lands by the United States in trust for the Tribes and individual Indians as the individual parcels were purchased. Beginning in latter 1975, the Okanogan County Commissioners refused to consent to further land acquisitions by the United States. After the refusal to consent, the Secretary of the Interior continued to make such acquisitions, which acquisitions have been taxed by the county.

Prior to 1970, the Board of Ferry County Commissioners gave its consent to the pur-

---

1. The 1954 "agreement" provided for payment by the Tribe of $40,000 a year to the Defendant counties "in lieu of payment of taxes" for the performance of county governmental services. The Tribes made payments to the Defendant counties from 1954 to 1970 and have made no subsequent payments. The validity of the contract is strongly disputed by the Tribes. In 1972, the Defendant counties filed an action against the Plaintiff Tribes in this District based upon the contract. Judge Powell granted the Tribes' Motion to Dismiss for lack of jurisdiction which dismissal was not appealed. Early during the present lawsuit, Defendant counties counterclaimed for monies allegedly owed by the Tribes under the contract. Judge Neill dismissed the counterclaim on the basis of tribal immunity. The parties agree that it is unnecessary for this Court to reach the disputed issues surrounding said contract for disposition of the present motions, and the contract matter has not in any way been considered by the Court or influenced the Court's ruling in the present matter.

chase of land within Ferry County by the United States in trust for the plaintiff Tribes and individual Indians on an individual basis. In 1970, Ferry County gave consent to the acquisition of land by the United States in trust unless the Colville Tribes were notified that the Commissioners objected to a transfer within 30 days after receiving notice of the intention to purchase land. On September 11, 1972, the Ferry County Commissioners revoked their consents to the acquisitions retroactive to April 6, 1970, and have since, with one exception (1.94 acres), refused to consent to further land acquisitions by the United States. The Secretary of the Interior continued to make acquisitions. Since September 11, 1972, Ferry County, retroactive to 1969, has taxed those tracts acquired by the United States.

## DECISION

The issues in this action have been significantly distilled since the early pleading stages of the lawsuit. The broad issue now is whether PL–772 allows the counties to tax lands purchased by the Secretary without the consent of the counties.

## I.

PL–772 provides that county commissioner consent is not needed when Indian lands are involved. Specifically, Section 2 provides that consent is needed only as to non-Indian lands. The parties now agree that Indian lands within the meaning of this statute include lands owned in fee by individual Indians (or the Tribe).[2] It is the contention of the defendant counties, however, that although county commissioner consent is not needed when Indian owned fee lands are being transferred into a trust status, such a transfer must nevertheless be for the purpose of "consolidation" to be

2. That is, Defendants do not argue that Congress intended the definition of "Indian" lands to include only trust lands and not fee lands owned by individual Indians. Consequently, it is unnecessary for this Court to address that proposition.

3. The Court notes in passing that the term, "consolidation" is nowhere defined or limited

authorized by PL–772. Defendants' argument is partially based upon their plain reading of Section 2 of the statute:

> For the purpose of *effecting land consolidation* between the Colville Indians and non-Indians in Ferry and Okanogan Counties, the Secretary of the Interior is hereby authorized . . . . (Emphasis added.)

Defendants argue further that the transfer of bare legal title from an Indian to the United States with the Indian retaining the complete beneficial interest, just as before the transfer, cannot constitute a "consolidation" within the meaning of Section 2.

There is no jurisdiction under 28 U.S.C. § 2201 to issue a declaratory judgment unless a "justiciable controversy" exists. *International Video Corporation v. Ampex Corporation*, 484 F.2d 634, 636 (9th Cir. 1973). As stated above, Defendants now admit that county consent is unnecessary as to land owned by Indians. It is then argued that the Secretary cannot acquire such land in trust. However, there are no facts before the Court regarding this question, and the matter was not raised as an issue except to the extent that the Tribes advanced the argument to support its contention that acquisition did not require consent. With no evidence submitted, the factors that the Secretary took into account in exercising his discretion are not known to the Court. See, *Chase v. McMasters*, 573 F.2d 1011, 1016 (8th Cir. 1978). Hence, upon admission that consent was not required, the question became moot. The Court must therefore decline the invitation "to impose a definitive gloss," *Chase v. McMasters, supra*, upon the meaning of the purpose, "land consolidation," as it relates generally to acquisition of Indian-owned land.[3]

in the Act or its legislative history, including the legislative history of its predecessor bills. Undoubtedly, the use of the term encompasses two different land bases within the Reservation. Inherent in such consolidation is the possibility that, quantitatively, each distinct land base could theoretically grow. This observation, as to acquisition of the Indian-owned land, would seem to obviate consideration of wheth-

## II.

Turning to the non-Indian land within the Reservation, the parties also argue, in part, that the issue of consent should be decided with a view of the purposes for enactment of PL–772, and, more specifically, with a view of the intent behind Section 2 of the Act. Much of the briefing focuses on whether the "consolidation purposes" of Section permit expansion of the Tribal land base within the Reservation, and if consolidation does not include expansion, whether the "restoration" purpose of Section 1 spills into Section 2 to allow expansion. Finally, the parties argue about the extent, if any, county tax base preservation was in the collective mind of Congress when enacting the statutes in question. For a variety of reasons, the Court concludes that it is the fiscal integrity issue that goes to the heart of interpreting the consent provision as mandatory or directory. Contemplating the mystical definition of consolidation, or the lack thereof, does little, if anything, to aid in finding a solution to interpretation of "shall consent". Rather, intent as to consolidation flows to consideration of the standards to guide the actions of the Secretary, and not to the county action which is the subject of this lawsuit.

■ The law is well settled that ambiguities in federal statutes dealing with Indians are to be resolved favorably to the Indians. *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655, 660 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977). The Court recognizes that this principle is more than a canon of construction, ". . . easily invoked and as easily disregarded. It is an interpretive device, early framed by John Marshall's legal conscience for ensuring the discharge of the nation's obligations to the conquered Indian tribes." *Santa Rosa Band of Indians, supra*, 532 F.2d at 660. Nevertheless, the rule may only be invoked where the statutory language can "reasonably be con-

strued to confer" the benefit. The canon does not require a strained reading of the statute. *United States v. Anderson*, 625 F.2d 910, 913 (9th Cir. 1980). The statute in question in the present case is facially unambiguous. Therefore, *Santa Rosa* is not applicable. The plain reading of PL–772 is that the county commissioners must consent before non-Indian owned lands may be taken into trust in such a way as to be nontaxable (Section 3) and therefore decrease the tax bases of the affected counties. Its legislative history considered against the backdrop of contemporaneous acts supports the plain meaning of Section 2 which reads in relevant part that "(i)n carrying out the provisions of this statute, if non-Indian lands are involved the board of county commissioners of counties in which land is located shall by proper resolution consent before such non-Indian land is acquired for the tribe or an individual Indian. . . ." To hold that the consent language is merely directory would be to attribute to Congress enactment of a futile and meaningless act. It is a basic tenet of statutory construction that Congress is not presumed to perform useless acts. *Bird v. United States*, 187 U.S. 118, 124, 23 S.Ct. 42, 44, 47 L.Ed. 100 (1902).

The legislative history shows that in addition to the stated restoration and consolidation purposes of the Act, preservation of the county tax base was also an important consideration. A precursor to PL–772, H.R. 2432 was almost identically worded to Sections 1–3 of PL–772. In the hearings before the subcommittee on Indian Affairs of the Committee on Public Lands, House of Representatives, and the Committee on Interior and Insular Affairs, United States Senate, Eighty-First Congress in 1949, Mr. Zimmerman, acting Commissioner of Indian Affairs stated:

> The reason for including this [consent] provision is simply this: The Counties felt that the right to buy and sell lands should not be used to diminish the existing tax

er congress intended that Section 2 have a separate purpose to enlarge the tribal land base, other than the stated consolidation purpose. See *Chase v. McMaster, supra*, and *City*

*of Tacoma v. Andrus*, 457 F.Supp. 342 (D.D.C. 1978), for a discussion of taking Indian land into trust under similar statutory language.

base. This provision (sic) put in at their request. I don't know if there is a State statute in the matter or not. But the *Indians have agreed that they want authority to reorganize their holdings but they do not want to take off the tax rolls any additional lands without the county's (sic) consent.* (Emphasis added.)

*Subcommittee Hearings, supra,* at 22. At page 52, the following exchange was made:

MR. BARRATT. Mr. Chairman, I don't like that language there 'shall give their written consent.' That would leave the matter open if one member of the board refused to give his consent.

MR. MORRIS. The board can act with a majority. I think they always do.

That the legislators were aware that the county commissioners were the taxing officials was also manifested at the Hearings:

MR. ZIMMERMAN. On the same page, page 2, section 2, line 12. We suggest that the word 'proper' should be stricken, and word 'taxing' should be added after the word 'county.'

. . . .

MR. ZIMMERMAN. In a similar bill we suggested that the county commissioners would be the proper persons.

*Subcommittee Hearings, supra* at 52.

That the tax import of PL–772 was before the Subcommittee of the Committee on Interior and Insular Affairs is evident since, on July 29, 1949, at pages 74 and 75, the following colloquy took place:

MR. ZIMMERMAN. I would like to bring to the attention of the committee, Mr. Chairman, a subsidiary purpose in section 2, just so there may be no question raised later.

Section 2 of the bill authorizes the tribe to make exchanges of lands within the reservation boundaries.

. . . . .

Now, proceed, Mr. Zimmerman.

MR. ZIMMERMAN. Section 2 would authorize the tribe to make certain exchanges solely within the reservation boundaries.

To give you an idea of the conglomerate picture, the land-ownership pattern, there are some areas in which there is isolated white ownership which should be eliminated, and certain areas in which the tribe ought to get rid of its holdings.

SENATOR ANDERSON. This bill permits exchange of the lands?

MR. ZIMMERMAN. Yes, sir.

I call particular attention to the language, line 13, page 2, which provides in the event any exchanges or purchases are made involving non-Indian lands, that is, lands presently taxable, the consent of the board of county commissioners of the county in which the land is located must be obtained. That was by agreement of the two boards of county commissioners to safeguard the tax structure.

SENATOR ANDERSON. Is there ample provision in here to safeguard the rights of the Indians on these exchanges?

MR. ZIMMERMAN. Yes, sir; they are ample.

SENATOR ANDERSON. And you see no danger in this exchange provision from the standpoint of the Government, the Indians, or the counties involved?

MR. ZIMMERMAN. I think that is correct.

MR. KEITH (counsel for the Tribes at that time). I may say, Mr. Chairman, *any exchange is subject not only to the approval of the county commissioners of the county involved but also to the approval of the governing body of the tribe. So, it is a bilateral approval between the only two agencies which would be affected, which is required in order to effect any exchange.* (Emphasis added).

Defendants rely upon comparison of PL–772 with three other acts of Congress: 25 U.S.C. § 608 (the Act of July 28, 1955, 69 Stat. 392, as amended by the Act of August 31, 1964, 78 Stat. 747) (hereinafter the "Yakima Act"); 25 U.S.C. § 610–e (1968) (hereinafter the "Swinomish Act"); and 25 U.S.C. § 487 (the Act of June 10, 1968, 82 Stat. 174, as amended by the Act of May 21, 1974, 88 Stat. 142) (hereinafter the "Spokane Act").

The Court, having made an independent search of contemporaneous Congressional acts, finds the Yakima, Swinomish, and Spokane Acts persuasive for concluding that the County consent language is mandatory and not directory. As stated above, however, to conclude so does not require going through the machinations of ivory tower gymnastics for an erudite definition of "consolidation." Again, this is because the term in question is "consent", and the official action of concern is that of the counties and not of the Secretary.

With the Yakima Act, the 1964 amendment explicitly stated that newly acquired trust lands were to be taxed. Like the Colville Indian Reservation, the Yakima Reservation embraces a significant area, and the wording of the legislation shows the need to maintain the status quo with respect to the tax base in the affected counties. Consideration of the Yakima Act, then, buttresses the conclusion that the county consent provision is mandatory rather than merely directory since PL–772's legislative history manifests the Congressional concern for maintaining the tax status quo. The Swinomish Act also shows that the consent language is more than merely directory. With this Act, lands within the reservation were not taxed, but lands acquired without were taxed. The Swinomish Reservation is very small; hence, within Reservation acquisitions had minimal impact. However, Congress clearly manifested its concern to protect the fiscal integrity of the area for it explicitly required the major acquisitions to be taxed.

Although the present Spokane Act offers no assistance with the interpretation problem at bar, the pre-1974 equal in, equal out provision shows that Congress consistently is aware of the necessity of maintenance of the county tax base. Thus, interpreting the consent provision in any way but as mandatory ascribes to Congress a useless act.

### III.

■ Interpreting the consent provision as mandatory does not present a constitutional problem. Under the Necessary and Proper Clause, Art. I, Sec. 8, of the Constitution, Congress has the power to delegate its authority to other governmental entities. *Lichter v. United States*, 334 U.S. 742, 778, 68 S.Ct. 1294, 1313, 92 L.Ed. 1694 (1949). Moreover, the Court finds that the Appointments Clause, Art. II, Sec. 2, Cl. 2, of the Constitution does not put Congress into such a "rigid box" as to preclude conditioning operation of PL–772 upon the consent of local officials. *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), is inapposite since that case did not concern local officials. The other case relied upon by the Tribes, *Parker v. Richard*, 250 U.S. 235, 39 S.Ct. 442, 63 L.Ed. 954 (1919), did not result in the striking of the questionable act as unconstitutional.

Concern for accountability has shaped the requirement that delegated power must include at least rough standards to guide the delegated party. This rule insures that the essential policy determinations are made as contemplated by Congress and that the delegatee exercises that power within judicially cognizable boundaries. That is, the Courts are to be able to determine whether the given action falls within the scope of the power delegated.

The rough standards exist in the case at bar. The county commissioners, as taxing officials, may withhold consent for the purpose of protecting the counties' tax base. To avoid the Scylla of unlawful delegation on one hand, and the Charybdis of the Appointment Clause, on the other hand, this Court cannot but find that, logically, Congress must have intended the 1956 potential tax base to be the one protected.

This result is consistent with the pre-1974 Spokane Act's equal in, equal out provision which would track that Act to the tax base potential at the time of enactment. Congress could have effectuated protection for the tax base by other means but did not choose to do so, and, however poorly the Act may be drafted, it is not for this Court to rewrite the statute.

Although the counties went unprotected under the I.R.A., with the Yakima Act, the Tribe had to pay taxes on all fee land taken

into trust. With the Spokane Act, there was an equal in, equal out provision. Under PL–772, Congress attempted to give flexibility to the acquisition process of non-Indian lands, but gave full protection to the Indian lands. In the words of one legislator, Section 2 was deemed "a sensible provision."

## IV.

■ It is true that there is more than a mere presumption that public officials such as the county commissioners have performed their duties in compliance with the law. In fact, there must be clear evidence to the contrary, before the Court may find that they have acted unlawfully. *United States v. Chemical Foundation*, 272 U.S. 1, 14, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *Board of Trade of Kansas City v. Milligan*, 90 F.2d 855 (9th Cir.), *cert. denied*, 302 U.S. 710, 58 S.Ct. 40, 82 L.Ed. 549 (1937). The Court finds that the revocation of consent, once given as to specific acquisitions and the retroactive taxation of such acquisitions to be in derogation of PL–772. However, the Court does not find the refusal to consent since 1972 to acquisition of non-Indian fee land in Ferry County and refusal to consent since 1975 to such acquisition in Okanagan County to be unreasonable. Hence, it

ORDERED, ADJUDGED AND DECREED that Motions of the Plaintiffs and Defendants for Summary Judgment are granted in part as follows:

1. All lands acquired by the United States in trust for the Tribes and individual Indians with blanket or individual consent of Defendants, although later revoked, are non-taxable, and all tax assessments against such lands are null and void. Title is quieted in all such lands.

2. The consent provision in Section 2 of PL–772 applies only to those lands held in fee by non-Indians prior to the action of the United States in acquiring such land in trust for the Tribes and individual Indians. Any post-acquisition tax assessment of trust lands which prior to Section 2 acquisition by the United States were fee lands held by Indians is null and void. Title is quieted in all such lands.

3. Refusal to consent does not invalidate acquisitions by the United States of non-Indian fee lands under Section 2. However, refusal to consent precludes application of the Section 3 tax exemption to such lands.

4. Each party shall bear its own costs incurred in this action.