*Perkins v. Commissioner*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term 2019

(Argued: May 21, 2020 | Decided: August 12, 2020)

Docket No. 19-2481

ALICE PERKINS, FREDRICK PERKINS,

*Petitioners-Appellants*,

v.

COMMISIONER OF INTERNAL REVENUE,

*Respondent-Appellee*.

_____

Before:

SACK, WESLEY, LIVINGSTON, *Circuit Judges*.

Alice and Fredrick Perkins (the "Perkinses") operate a company that sold gravel mined from land belonging to the Seneca Nation of Indians. The Perkinses filed this action in tax court seeking a redetermination of their 2008 and 2009 joint individual tax returns, in which they sought an exemption for income derived from their gravel operation. The Perkinses argue that their gravel sales during 2008 and 2009 were exempt from federal income taxes pursuant to two treaties between the United States and the Seneca Nation: the 1794 Treaty of Canandaigua and the 1842 Treaty with the Seneca. The tax court found that neither treaty created an exemption from federal income taxes and assessed penalties.

In an issue of first impression for this Court, we agree with the tax court that neither the 1794 Treaty of Canandaigua nor the 1842 Treaty with the Seneca create

an individualized exemption from federal income taxes for income "derived from" Seneca land. We reject the Perkinses' argument suggesting otherwise because that view is premised upon the erroneous presumption that an exemption from federal taxes for income derived from land held in trust for American Indians extends to land that remains in the possession of the Seneca Nation of Indians. Finally, we note that, to the extent the 1842 Treaty with the Seneca creates an exemption from taxes on Seneca land, that exemption does not cover income derived from Seneca land by individual enrolled members of the Seneca Nation.

We **AFFIRM** the tax court and remand for further proceedings consistent with this opinion.

————————————

MARGARET A. MURPHY, Hamburg, NY (Gary D. Borek, Cheektowaga, NY, *on the brief*), *for Petitioners-Appellants*.

JACOB CHRISTENSEN, Attorney (Travis A. Greaves, Deputy Assistant Attorney General, Francesca Ugolini, Attorney, *on the brief*), *for* Richard E. Zuckerman, Principal Deputy Assistant Attorney General, Tax Division, U.S. Department of Justice, Washington, DC.

————————————

WESLEY, *Circuit Judge*:

Alice Perkins is an enrolled member of the Seneca Nation of Indians (the "Seneca Nation" or the "Nation") who resides on the Seneca Nation's Allegany Territories with her husband, Fredrick.[1] Together they operate A&F Trucking,

---

[1] As the tax court noted below, "[n]omenclature is fraught in this field." J.A. 143 n.1. The official name of the Seneca Nation in English is the "Seneca Nation of Indians." *See* The Seneca Nation of Indians, *Culture*, https://sni.org/culture/ (last visited August 11, 2020) (hereinafter "*Culture*"). Much of the law and historical sources involving this area of the

which was involved in the mining and sale of gravel from land located within the Allegany Territories. The Perkinses filed their income taxes for the 2008 and 2009 years well after the filing due dates, claiming that the income earned from the sale of gravel mined on Seneca land was exempt from federal income tax by operation of a statute and two treaties between the United States and the Seneca Nation. After an audit, the Internal Revenue Service ("IRS") disagreed that the revenue generated from A&F Trucking's gravel sales was exempt from federal taxes and issued a notice of deficiency to the Perkinses assessing penalties for their late filings.

In November of 2014, the Perkinses filed this action in tax court seeking redetermination of their tax liabilities. They initially argued that a federal statute, the General Allotment Act of 1887, 24 Stat. 388 (codified at 25 U.S.C. § 334 *et seq.*), created an exemption for income derived from Seneca land. After abandoning that

---

law refer to the indigenous peoples who reside within the United States as "American Indians." The United States Department of the Interior's Bureau of Indian Affairs likewise uses the term "American Indians" to refer to members of federally recognized tribes, villages, or nations. In an effort to avoid confusion, and to ensure continuity with prior caselaw, we will use this term to refer generally to the indigenous peoples of the United States, or to refer to a body of law generally. Where possible, we will refer to the specific nation at issue in a prior case or in the historical record by its name. We will refer to the Seneca Nation of Indians, when referring to the governmental entity, as "the Seneca Nation" or the "Nation," as appropriate.

argument, they then claimed that the 1794 Treaty of Canandaigua, 7 Stat. 44 (Nov. 11, 1794), and the 1842 Treaty with the Seneca, 7 Stat. 586 (May 20, 1842), created an exemption from income taxes for income derived from land within the Seneca Nation. The tax court disagreed, finding that neither treaty supported an exemption from federal income taxation.

On appeal, the Perkinses argue that the tax court failed to liberally construe the treaties and that doing so would have shown the treaties supported an exemption to federal income taxes. *See, e.g.*, Pet'rs' Br. 13–25, 29–36. They also urge us to endorse language in several cases from other Courts of Appeals suggesting that income derived from Seneca land may be exempt under the Treaty of Canandaigua and the Treaty with the Seneca—which the Perkinses argue must be read together. *See id.* at 18–29.

We agree with the tax court. To the extent the language of either treaty could be construed to offer an exemption from taxes, those exemptions are constrained by the historical contexts under which they were drafted and therefore neither exemption extends to the Perkinses' gravel mining revenue. The text and context of the Treaty of Canandaigua demonstrates that it creates no tax exemption applicable to the Perkinses. Dicta in other cases suggesting the opposite are

4

incorrect; they would require the erroneous extension of a Supreme Court case that is inapposite where the land from which the income is derived is not held in trust by the United States for an American Indian taxpayer. While the 1842 Treaty with the Seneca contains an explicit exemption for taxes on Seneca land, we reject that a tax exemption applying to Seneca land must necessarily extend to income derived by individual members from Seneca land.

Because neither treaty exempts the Perkinses' gravel-mining income from federal income taxation, we affirm the tax court's decision and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

The Seneca Nation of Indians (the "Seneca Nation" or the "Nation"), was the largest of the Six Nations comprising the Iroquois Confederacy, otherwise known as the Haudenosaunee. *See generally Lazore v. Comm'r*, 11 F.3d 1180, 1182 (3d Cir. 1993) (discussing uncontradicted trial evidence); *see also Culture*, *supra* n.1. Historically, the Seneca Nation occupied territory throughout Central and Western New York. *See Culture*, *supra* n.1. The Seneca Nation continues to own and occupy land in Western New York, including an area known as the Allegany

Indian Territories (the "Allegany Territories") near the border of Pennsylvania. *See, e.g.,* Seneca Nation of Indians, *Territories*, https://sni.org/government/territories/ (last visited August 11, 2020).

### A. The Seneca Nation's Sand & Gravel Permitting Laws

The Seneca Nation retains ownership of land on its territories, and "allots" to individual members possessory interests in the use of a plot of the Nation's land. J.A. 98 § 102(C). Any land that is unallotted to individual members is retained by the Nation. J.A. 99 § 102(F). The Nation defines any "Nation Land" to mean "any lands" owned in fee simple by the Nation and subject to federal restrictions upon alienation, including the Allegany Territories. J.A. 100 § 102(R).

The Seneca Nation has specific laws governing the extraction and mining of natural resources on its land. "[A]ll minerals, including . . . gravel located within any Nation lands shall be and remain the sole and exclusive property of the Nation." J.A. 102 § 301. To lawfully extract gravel from land belonging to the Seneca Nation, the Nation must issue a permit. J.A. 102 § 302(A). A permit requires approval by the Nation's government and the consent of the "owner of record," who is the "Nation member holding an allotment pursuant to Nation law, custom, tradition or usage." *See* J.A. 100 § 102(T), J.A. 102 § 302.

6

Individual members of the Seneca Nation do not own land on its territories in fee simple. Instead, the Nation provides to individual members lifetime possessory interests in land. *See* Statement of Undisputed Facts, *Perkins v. United States*, No. 16-cv-00495, Dkt. 72-1 at ¶ 8 (W.D.N.Y).[2] The Nation retains ownership over the subsurface rights to all land in its territories. *See id.* at ¶ 9.

### B. The Perkinses & A&F Trucking

Petitioner Alice Perkins is an enrolled member of the Seneca Nation and, with her husband Fredrick, operates A&F Trucking ("A&F"). Alice and Fredrick (together, the "Perkinses") live on the Allegany Territories. In 2008, the Seneca Nation issued Alice and A&F a permit to mine gravel from certain land located in the Allegany Territories. In exchange for the right to mine gravel from land belonging to the Seneca Nation, A&F paid the Nation royalties on the proceeds earned from selling that gravel. A&F's permit was valid through June of 2009,

---

[2] As we note below, the Perkinses filed an action in the Western District of New York concerning their tax liabilities for the 2010 tax year. *See Perkins v. United States*, No. 16-cv-00495 (W.D.N.Y. June 16, 2016). We take judicial notice of certain of the parties' filings in that action because those filings concern the same parties and subject matter before this Court, and neither party disputes the contents of those filings. Thus, we may consider those documents for the truth of the matters asserted therein. *See Young v. Selsky*, 41 F.3d 47, 50–51 (2d Cir. 1994) (taking judicial notice of documents and testimony filed in another action for the truth of the matters asserted therein where no party contested the accuracy of the statements, both parties relied on the information).

when the Nation imposed a moratorium on mining and withdrew A&F's permit. A&F continued selling gravel that had already been mined through 2011.

Alton Jimerson, a member of the Seneca Nation, had a lifetime possessory interest over the 116-Acre plot of land from which A&F mined gravel. *See* Statement of Undisputed Facts, *Perkins v. United States*, No. 16-cv-00495, Dkt. 72-1 at ¶¶ 8–9 (W.D.N.Y June 15, 2018). Alice Perkins and A&F obtained permission from Jimerson, pending approval by the Seneca Nation, to mine gravel from the 116-Acre plot. The Perkinses mined gravel from Jimerson's land until A&F's permit was withdrawn by the Seneca Nation in 2009.

### C. The Perkinses' Tax Returns

The Perkinses filed their joint individual income tax returns for the 2008 and 2009 years in October of 2011, well after the filing due dates. The Perkinses attached a "detail sheet" to their returns and claimed that the income generated from A&F's sale of gravel during 2008 and 2009 was exempt from federal income tax under the General Allotment Act of 1887, 24 Stat. 388 (Feb. 8, 1887) (codified at 25 U.S.C. § 334 *et seq.*); *see also* 25 U.S.C. § 348. The Commissioner of Internal Revenue (the "Commissioner") issued a notice of deficiency to the Perkinses for the 2008–2010 tax years, and adjusted A&F's business income to include revenue

8

generated from the sale of gravel mined from the Allegany Territories. The Commissioner also sought to impose penalties upon the Perkinses for their late and inaccurate filings under I.R.C. §§ 6651(a)(1) and 6662(a).

The Perkinses claimed the same exemption in their 2010 tax return. They paid the tax, interest, and penalties demanded by the IRS; and then, in 2016, filed a claim in the United States District Court for the Western District of New York seeking a refund. The district court in that action denied the Commissioner's motion to dismiss and the parties' cross-motions for summary judgment, and the case is currently proceeding towards trial.[3]

## II.    Procedural History

In response to the Commissioner's notice of deficiency, the Perkinses filed a tax court petition seeking redetermination of their tax liabilities for the 2008 and 2009 tax years. Initially, they argued that the revenues from A&F's sale of gravel were not subject to federal income taxation because that income was "earned from the depletion" of American Indian land held in trust by the United States under the Indian General Allotment Act of 1887. *See* J.A. 84–85 (citing *Squire v. Capoeman*,

---

[3] The district court's decisions on the Commissioner's motion to dismiss, and on the parties' cross-motions for summary judgment, are not before this Court; we express no opinion on their reasoning or result.

9

351 U.S. 1 (1956)). The Perkinses later abandoned this argument for the reasons discussed below, and instead claimed that two treaties between the United States and the Seneca Nation created an exemption from federal income taxation for income derived from Seneca land. They argued that the 1794 Treaty of Canandaigua, 7 Stat. 44 (Nov. 11, 1794), and the 1842 Treaty with the Seneca, 7 Stat. 586 (May 20, 1842), exempted "income derived directly from" land belonging to the Seneca Nation from federal income taxation, which would include their gravel sales. J.A. 116–17; *see* J.A. 104.

The Commissioner moved for summary judgment.[4] The tax court found that the Treaty of Canandaigua did not exempt from taxation the income of individual members of the Seneca Nation, and that the tax exemption that appears on the face of the Treaty with the Seneca was directed at taxes on real property and not income derived from the sale of gravel. The tax court also determined that the Perkinses were liable for late filing penalties under I.R.C. § 6651(a)(1), but rejected the Commissioner's request for inaccurate filing penalties under

---

[4] The Perkinses did not assert that any material issues of fact precluded summary judgment.

I.R.C. § 6662.[5]  The tax court then entered a decision and order assessing penalties against the Perkinses for their late filings.  The Perkinses timely appealed.

## DISCUSSION

### I.  Jurisdiction & Standard of Review

This Court has jurisdiction to review decisions of the tax court and does so "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury."  I.R.C. § 7482(a)(1).  Venue is proper in the Second Circuit because the Perkinses reside in the Allegany Territories, located in the Western District of New York.  *See id.* § 7482(b)(1)(A).

We review the tax court's grant of the Commissioner's motion for summary judgment *de novo*.  *See Williams v. Comm'r*, 718 F.3d 89, 91 (2d Cir. 2013) (per curiam).  Because neither party raised as an issue before this Court penalties or the amount of any applicable penalties, we need only consider whether the Perkinses' gravel-mining income is subject to federal income taxation.  The dispute is a legal one: whether either of two treaties operates to exempt the Perkinses' gravel-mining income from federal income taxation.

---

[5] After the tax court's ruling, the Perkinses and the Commissioner stipulated that the Perkinses were not liable for accuracy-related penalties under I.R.C. § 6662(a).

11

## II. General Principles of The Internal Revenue Code and the Interpretation of American Indian Treaties

American Indian nations are "regarded as dependent nations, and treaties with them have been looked upon not as contracts, but as public laws which could be abrogated at the will of the United States." *Choate v. Trapp*, 224 U.S. 665, 671 (1912). Congress's "power to unilaterally abrogate provisions of treaties with [American] Indians is firmly established." *Lazore v. Comm'r*, 11 F.3d 1180, 1183 (3d Cir. 1993). Furthermore, it is "well settled by many decisions of [the Supreme] Court that a general statute in terms applying to all persons includes [American] Indians and their property interests." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960). The Internal Revenue Code applies to every individual and taxes "all income from whatever source derived." *See* I.R.C. §§ 1, 61(a). Thus, absent a specific exemption, American Indians are not, by virtue of their status, exempt from paying federal income taxes. *See Squire v. Capoeman*, 351 U.S. 1, 6 (1956); *Choteau v. Burnet*, 283 U.S. 691, 694–95 (1931).

While the Tax Code generally applies to American Indian citizens, "[i]n the area of taxation, Congress has passed neither a statute specifically abrogating the provisions of Indian treaties nor a statute of general application that has the effect of abrogating Indian treaties." *Lazore*, 11 F.3d at 1183. Instead, the Internal

Revenue Code must be applied "with due regard to any treaty obligation of the United States which applies to [the] taxpayer." I.R.C. § 894(a)(1). The question is therefore whether another act of Congress or a specific treaty creates an exemption applicable to the Perkinses' gravel-mining income. *See, e.g.*, *Squire*, 351 U.S. at 6.

Initially the Perkinses argued that the General Allotment Act of 1887, and a Supreme Court case interpreting that act, *Squire v. Capoeman*, 351 U.S. 1, 6–8 (1956), exempted their gravel-mining income from federal income taxation. For the reasons we discuss below, the Perkinses wisely abandoned that argument. Because they point to no other act of Congress that could create an exemption covering their gravel-mining income, the only question is whether a treaty between the United States and the Seneca Nation creates such an exemption.

### A. Interpreting Treaties with American Indian Nations

To determine whether an American Indian treaty creates an exemption from federal income taxes we "look beyond the written words to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999) (quoting *Choctaw Nation of Indians v.*

13

*United States*, 318 U.S. 423, 432 (1943)); *see also Seneca Nation of Indians v. New York*, 382 F.3d 245, 259 (2d Cir. 2004).

"[W]e interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196 (citations omitted). In doing so, this Court is bound to interpret treaties with American Indians liberally, construing treaties in favor of the American Indians. *See Choctaw Nation of Indians*, 318 U.S. at 431–32. Thus, ambiguous provisions are interpreted to the benefit of the American Indians, and, absent explicit statutory language, courts should refuse to find that Congress abrogated Indian treaty rights. *See County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247 (1985). Even so, "treaties cannot be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians*, 318 U.S. at 432 (citations omitted).

Furthermore, "to be valid, exemptions to tax laws should be clearly expressed." *Squire*, 351 U.S. at 6. Therefore, a tax exemption must "derive plainly" from the treaty itself, and "[t]he intent to exclude must be definitely expressed, where, . . . the general language of the act laying the tax is broad enough to include

14

the subject-matter." *Superintendent of Five Civilized Tribes v. Comm'r*, 295 U.S. 418, 420 (1935) (citations omitted). The Supreme Court has "repeatedly said that tax exemptions are not granted by implication" and "can not rest on dubious inferences." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 156 (1973) (citations omitted) (interpreting the application of the Indian Reorganization Act, 25 U.S.C. § 465, to state gross receipt taxes on a ski resort operated by the Mescalero Apache Tribe off reservation land).

The problem is more difficult when tasked with determining if an American Indian treaty, as opposed to a statute, gives rise to a tax exemption. The federal income tax did not exist in its present form until 1913, when the Sixteenth Amendment took effect. *See* U.S. Const. amend. XVI. As a result, it is nearly impossible for parties to treaties concluded prior to 1913 to have contemplated an exemption to a tax on income. Despite that, "doubts concerning the meaning of a treaty with an Indian tribe should be resolved in favor of the tribe." *Or. Dep't of Fish & Wildlife v. Klamath Indian Tribe*, 473 U.S. 753, 766 (1985) (citations omitted). Therefore, "the fact that the parties to a treaty did not negotiate with the federal income tax in mind is immaterial." *Lazore*, 11 F.3d at 1184. Nevertheless, complete

"silence as to matters of taxation will never be sufficient to establish an exemption." *Id*.

Thus, we are presented with contradictory doctrines: we interpret Indian treaties liberally in favor of the American Indians, but tax code exemptions cannot be implied. Our sister circuits have ably dealt with the same question. *See, e.g.*, *Lazore*, 11 F.3d at 1184; *Ramsey v. United States*, 302 F.3d 1074, 1078–79 (9th Cir. 2002). Although they appear to disagree as to *how* they solve this riddle, *see, e.g.*, *Lazore*, 11 F.3d at 1184–85 & n.2, we think this disagreement is without real difference.[6]

---

[6] For example, the Third and the Eighth Circuits have applied a liberal interpretation to American Indian treaties "only if such . . . treaty contains language which can reasonably be construed to confer income [tax] exemptions." *Lazore*, 11 F.3d at 1185 (first alteration in original) (quoting *Holt v. Comm'r*, 364 F.2d 38, 40 (8th Cir. 1966)). The Ninth Circuit, on the other hand, has reasoned that "notwithstanding the canon of interpretation that resolves ambiguities in statutes and treaties in favor of Indians, [courts] have recognized that the intent to exempt income of Indians from taxation must be *clearly expressed*." *Ramsey v. United States*, 302 F.3d at 1079 (alterations and citations omitted and emphasis added). And "unless express exemptive language is first found in the text of the statute or treaty," the Ninth Circuit does "not engage the canon of construction favoring the [American] Indians." *Id.* While "[t]he language need not explicitly state that [American] Indians are exempt from the specific tax at issue[,] it must only provide evidence of the federal government's intent to exempt Indians from taxation." *Id.* at 1078. Each circuit's mode of interpretation requires textual support within a treaty for a tax exemption before the canon of liberal construction applies. *Compare Ramsey*, 302 F.3d at 1078 ("The applicability of a federal tax to Indians depends on whether express exemptive language exists" but "[t]he language need not explicitly state that Indians are exempt from the

We think the best approach is to first examine each treaty at issue within its historical context. *See Seneca Nation of Indians*, 382 F.3d at 259. If any exemptive language is found within the treaty, we will interpret that language liberally in favor of the American Indian; but in doing so we will remain mindful that our interpretation cannot re-write the treaty beyond the bounds of its historical grounding and context. *See Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196; *Choctaw Nation of Indians*, 318 U.S. at 431–32. A liberal reading of a document does not authorize unmooring it from its purpose or place in history.

## III.   The 1794 Treaty of Canandaigua

### A. Historical Background

During the American Revolutionary War, the Seneca Nation, along with the Cayuga, Onondaga, and Mohawk nations aligned themselves with Great Britain. *See, e.g., Oneida Indian Nation of N.Y. v. New York*, 691 F.2d 1070, 1077 (2d Cir. 1982).

---

specific tax," and need only "provide evidence of the federal government's intent to exempt Indians from taxation.") *with Lazore*, 11 F.3d at 1186–87 (finding that the Treaty of Canandaigua created no exemption to the federal income tax despite language guaranteeing "free use and enjoyment," because there was no language "capable of being construed more broadly"). Furthermore, the examples of exemptive language given by the Ninth Circuit in *Ramsey*, including "[t]reaty language such as 'free from incumbrance,' 'free from taxation,' and 'free from fees,'" *see Ramsey*, 302 F.3d at 1078–79, demonstrate that the Ninth Circuit requires little more than "language which can reasonably be construed to confer [tax] exemptions," *Holt*, 364 F.2d at 40.

While the 1783 Treaty of Paris, 8 Stat. 80 (Sept. 3, 1783), effectively ended the war by concluding hostilities between the United States and Great Britain, it was silent with respect to those members of the Six Nations that supported the British. The 1784 Treaty of Fort Stanwix, 7 Stat. 15 (October 22, 1784),[7] between the United States and all members of the Six Nations—including the Oneida and Tuscarora nations, who supported the United States in the war—ended hostilities between the United States and the Haudenosaunee.

The Treaty of Fort Stanwix treated the loyalist Haudenosaunee nations harshly compared to the Oneida and Tuscarora: it required significant land cessions from the Seneca, including the cession of the Six Nations' claims to land in the Ohio Valley. *See id.* at Art. I–III. "The net effect of this cession was to force the Senecas to give up most of their land in New York to the national government." Jack Campisi & William A. Starna, *On The Road to Canandaigua: The Treaty of 1794*, 19 Am. Indian Q. 467, 469 (1995). The Treaty of Fort Stanwix, along with the later treaties of Fort McIntosh and Fort Harmar, caused considerable friction between

---

[7] While there were several treaties concluded at Fort Stanwix, hereinafter "the Treaty of Fort Stanwix" refers only to the treaty concluded in 1784 between the United States and the Six Nations.

the United States and the Six Nations. *See id.* at 468–70. While one of the United States' primary concerns was securing land in the Ohio Valley,[8] these treaties, in particular the Treaty of Fort McIntosh, instead led to hostilities and violence between the American Indian nations residing in the Ohio Valley and the United States. *See id.* at 469–70.

Thus, the negotiations leading to the Treaty of Canandaigua that took place from 1789 to 1794 were motivated by the United States' desire to secure the neutrality of the Haudenosaunee nations as the United States engaged in likely—and then open—warfare with American Indian nations in the Ohio Valley. *See generally id.* at 471–81. The primary issue resolved by the Treaty of Canandaigua was disputed land cessions stemming from both the Treaty of Fort Stanwix and the Treaty of Fort Harmar. *See id.* at 470, 478–79 ("The great object of the treaty . . . was to remove complaints respecting lands" (quoting the United States' chief negotiator, Thomas Pickering)). The effect of the Treaty of Canandaigua was to restore to the Six Nations—in particular, the Seneca—land ceded to the United

---

[8] While the Treaty of Paris ceded control over the Ohio Valley from Great Britain to the United States, *see* 8 Stat. at 81–82, it did nothing to secure American settlement and claims in the region from the American Indian nations residing therein.

States, New York, and Pennsylvania. It also relinquished Haudenosaunee—in particular, Seneca—claims over the Erie Triangle, a tract of land near present Erie, Pennsylvania that runs from New York's western border to Ohio's eastern border and guarantees Pennsylvania access to Lake Erie. *See id.* at 483–86.

The Treaty of Canandaigua thus accomplished three objectives: "(1) it secured for the United States whatever title the Six Nations had to the Ohio Valley, thereby strengthening its claims against those of other nations [such as the British and French]; (2) it returned to the Senecas the land they had lost at Fort Stanwix in 1784; and (3) it secured by treaty, which seemed a stronger assurance than legislation to the Six Nations, their reservations in New York, laid out in state agreements." *Id.* at 486. The core of the Treaty of Canandaigua concerned the Senecas, "and those segments of other tribes that shared their territory, the Cayugas and Onondagas," because those nations in particular "presented a threat to national security" by virtue of being among the most powerful of the Six Nations, the most aggrieved by previous treaties, and therefore the most likely to present a military impediment to the United States' war with the nations in the Ohio Valley. *See id.*

## 1. The Treaty of Canandaigua

The Treaty of Canandaigua contains seven articles. *See* 7 Stat. 44. The preamble states that the purpose was to "remov[e] from [the Six Nations'] minds all causes of complaint, and establish[] a firm and permanent friendship" between the Six Nations and the United States.[9] Most relevant to this appeal, Article III describes the boundaries of the Seneca Nation's territory, and then states:

> Now, the United States acknowledge all the land within the aforementioned boundaries, to be the property of the [Seneca] nation; and the United States will never claim the same, nor disturb the [Seneca] nation, nor any of the Six Nations, or of their Indian friends residing thereon and united with them, in the free use and enjoyment thereof: but it shall remain theirs, until they choose to sell the same to the people of the United States, who have the right to purchase.

7 Stat. at 45. The Haudenosaunee recorded the Treaty of Canandaigua in the Two Row Wampum, a belt consisting of two parallel rows of dark colored beads on a

---

[9] Article I states that "[p]eace and friendship are hereby firmly established . . . between the United States and the Six Nations." 7 Stat. at 44. Article II contains an acknowledgement that land reserved to the Oneida, Onondaga, and Cayuga nations by treaties with the state of New York would never be claimed nor disturbed by the United States, and contains nearly identical language to Article III. *Id.* at 45. In Article IV, the Six Nations commit not to "claim any other lands within the boundaries of the United States; nor ever disturb the people of the United States in the free use and enjoyment thereof." *Id.*

background of white beads, which signify two peoples "coexisting peacefully, neither imposing their laws or religion on the other." *Lazore*, 11 F.3d at 1186.[10]

### B. The Treaty of Canandaigua Creates No Exemption to Federal Income Taxation.

The Treaty of Canandaigua offers no textual support for an exemption to the federal income tax. Article III's promise not to "disturb the [Seneca] . . . in the free use and enjoyment" of their land cannot be "reasonably construed as supporting an exemption from the income tax." *See Lazore*, 11 F.3d at 1187. Several other circuit courts have examined the Treaty of Canandaigua and rejected the idea that this language created an exemption from similar federal taxes. *See, e.g., Lazore*, 11 F.3d at 1186–87 (finding members of the Mohawk Nation were not exempt from federal income taxation by virtue of their status or by operation of the Treaty of Canandaigua); *Cook v. United States*, 86 F.3d 1095, 1097–98 (Fed. Cir. 1996) (rejecting an argument that the Treaty of Canandaigua created an exemption for members of the Onondaga Nation from federal excise taxes on the sale of diesel

---

[10] Because this case is before us on a motion for summary judgment, we note that many of the historical facts surrounding the Treaty of Canandaigua and the Treaty with the Seneca were not submitted as part of the record *per se*. Nevertheless, neither party disputes the historical record, and in fact both parties have cited to some of the same cases and authorities from which we draw contextual support.

fuel on Onondaga land).  Like other treaty provisions which secure the "peaceful possession" of American Indian land, guaranteeing the "free use and enjoyment" of the land "applies to the use of land," not to taxes levied upon individuals who profited from the use of the land.  *See Cook*, 86 F.3d at 1097–98.

Neither the context of nor history surrounding the Treaty of Canandaigua suggests that the parties intended to address taxation at all.  The Perkinses argue, counterfactually, that the United States' goal of "removing from [the Six Nations'] minds all causes of complaint," 7 Stat. at 44, would have been undermined by taxing members of the Seneca Nation since doing so "would have" given cause for complaint.  *See* Pet'rs' Br. 19.  But this ignores that the "great object of the treaty . . . was to remove complaints respecting lands" that had been ceded by the Senecas as punishment for their participation in the Revolutionary War.  *See* Campisi & Starna, *supra*, at 479.[11]

Thus "free use and enjoyment" is better interpreted as preventing American encroachment onto Seneca lands, or interference with the Seneca Nation's use of its lands.  *See, e.g.*, *Jourdain v. Comm'r*, 617 F.2d 507, 508–509 (8th Cir. 1980) (per

---

[11] Few citizens welcome taxation, but the Treaty's focus was Haudenosaunee complaints respecting land.

23

curiam) (finding language in the Treaty with the Tribes of Indians of Greenville guaranteeing freedom from "molestation from the United States" sought only to prevent "interference with the rights of Indians to hunt and otherwise enjoy their land, not the 'right' to be free from federal taxation.").

This conclusion is supported by more contemporaneous examples of encroachment by private citizens onto Seneca land. For example, less than sixty years after the Treaty was concluded, the Supreme Court applied the Treaty of Canandaigua and two later treaties, the 1838 Treaty with the New York Indians (hereinafter the "Treaty of Buffalo Creek") and the 1842 Treaty with the Seneca, to permit an action in trespass against private citizens who forcibly removed a member of the Seneca Nation from the Tonawanda territory. *See, e.g.*, *Fellows v. Blacksmith*, 60 U.S. 366, 371–72 (1856). Therefore, we find the language "free use and enjoyment" creates no exemption from federal income taxation.

The Perkinses urge us to follow dicta from several courts interpreting the Treaty of Canandaigua or analogous language that suggests the treaty might create an exemption for income derived from the land. *See, e.g.*, *Lazore*, 11 F.3d at 1187; *Hoptowit v. Comm'r*, 709 F.2d 564, 566 (9th Cir. 1983). The Third Circuit, for example, hypothesized that the Treaty of Canandaigua's guarantee of "free use

24

and enjoyment" "might be sufficient to support an exemption from a tax on income derived directly from the land." *Lazore*, 11 F.3d at 1187 (citation omitted). In *Lazore*, two members of the Mohawk Nation claimed they were generally exempt from paying federal income taxes by virtue of their membership in the Mohawk Nation. *See id.* at 1181. The Lazores received income as compensation for their employment, Mr. Lazore was a mechanic and Mrs. Lazore was an executive director for the Mohawk Indian Housing Corporation. They claimed that their membership in the Mohawk Nation exempted them from federal taxes, and did so by pointing to, among other sources, the Treaty of Canandaigua. *See id.* at 1182. The Third Circuit disagreed with the Lazores that the Treaty of Canandaigua's guarantee of "free use and enjoyment" was "capable of being reasonably construed as supporting an exemption from the income tax," but speculated based on the Circuit's analysis of *Hoptowit* that "[t]he language relied on by the Lazores might be sufficient to support an exemption from a tax on income derived directly from the land." *Id.* at 1187 (citing *Hoptowit*, 709 F.2d at 566). Because the language could not be construed more broadly to serve as a *general* exemption from income tax liability, the Third Circuit rejected the Lazores' claim. *See id.*

Similarly, the Ninth Circuit postulated that "any tax exemption created by" the language "exclusive use and benefit" in the Treaty with the Yakimas of 1855, 12 Stat. 951 (June 9, 1855), "is limited to the income derived directly from the land." *Hoptowit*, 709 F.2d at 566. In *Hoptowit*, the Ninth Circuit rejected claims that payments to a member of the Yakima Indian Nation for service as an elected Tribal Council Member were exempt from federal income taxation. *See id.* at 565. Hoptowit argued that treaty language setting out certain land "for the exclusive use and benefit of [the Yakima]" "guarantee[d] the Tribe's right to distribute the income from the reservation's resources for the exclusive benefit of its members," and "express[ed] a tax exemption as clearly as was possible a half century before the enactment of federal income taxation." *Id.* at 565–66 (quoting 12 Stat. at 952). The Ninth Circuit had previously relied on *Squire v. Capoeman*, 351 U.S. 1 (1956), to draw a line between income earned in compensation for services and income that was "derived directly from the land." *See id.* at 566 (discussing *Comm'r v. Walker*, 326 F.2d 261 (9th Cir. 1964)). The Court found that its analysis was "equally applicable" to *Hoptowit*, and that "any tax exemption created by [the Treaty's] language is limited to the income derived directly from the land. It [did] not

26

extend to the use of that income to compensate Hoptowit for his service as a Tribal council member." *Id.*

The Perkinses argue that *Lazore* and *Hoptowit* compel us to accept that "free use and enjoyment" "confer[s] a federal tax exemption for income earned from the sale of gravel mined on the Seneca Nation's territory." Pet'rs' Br. 27–28. We disagree. *Lazore* and *Hoptowit* attempt to extend the Supreme Court's logic in *Squire* beyond the statutory context—the General Allotment Act—in which *Squire* was decided.

The General Allotment Act was intended to conform American Indian land ownership to the individual property ownership existing in much of the United States by dividing American Indian reservations into uniform parcels of private land called "allotments." *See* 24 Stat. at 388; *see also United States v. Anderson*, 625 F.2d 910, 912 (9th Cir. 1980). Allotments were generally inalienable because they were held in trust by the United States for an individual American Indian and his or her heirs. *See Anderson*, 625 F.2d at 912. At the end of the trust period, allottees were to receive their lands "in fee, discharged of said trust and free from all charge or incumbrance whatsoever." 24 Stat. at 389.

In *Squire v. Capoeman*, 351 U.S. 1 (1956), the Supreme Court found that the General Allotment Act exempted from federal capital gains taxes proceeds from the sale of timber on land allotted to a member of the Quinaielt Tribe of Indians. Amendments to the General Allotment Act provided to the Secretary of the Interior the power to "issue" a "patent in fee simple," thereby removing "restrictions as to sale, [e]ncumbrance, or taxation" once the Secretary was "satisfied that any Indian allottee is competent and capable of managing his or her affairs . . . ." *Id.* at 7. Amendments to the act supported exempting the timber revenue from federal taxation because "it [was] not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian." *Id.* at 8. Furthermore, because the timber at issue constituted the primary value of the allottee's land, unless the revenue from its sale was preserved for the allottee and was not taxed, he would not "go forward when declared competent with the necessary chance of economic survival" that the Act sought to impart. *Id.* at 10. Thus "to prepare the Indians to take their place as independent, qualified members of the modern body politic . . . it [was] necessary to preserve the trust and income derived directly [from allotted land]." *Id.* at 9 (internal quotation marks and citation omitted).

28

If the Perkinses had mined gravel from land held in trust by the United States for Alice or one of her ancestors, it is evident that *Squire* would operate to exempt the gravel-mining income from federal taxes. However, as the tax court noted, the Perkinses were right to abandon their reliance on the General Allotment Act prior to summary judgment. The General Allotment Act has never applied to the Seneca Nation's territories. *See* 25 U.S.C. § 339. Furthermore, the Seneca Nation's land remains held in fee simple by the Nation itself; it is neither "allotted" to nor held in trust for any individual member by the United States Government.

The key to the Supreme Court's decision in *Squire* was that "[t]he purpose of the allotment system was to protect the Indians' interest and to prepare [them] to take their place as independent, qualified members of the modern body politic." 351 U.S. at 10 (internal quotation marks omitted). Thus it was "necessary to preserve the trust and income derived directly [from the allotted land]." *Id.* at 9 (citation omitted). The paternalistic rationale of *Squire* is intimately related to the idea that certain land was held in trust for American Indian individuals; it has little application where the relevant income derives from a license over land belonging

to an American Indian nation, or from land not allotted to the individual American

Indian.[12]

Other courts have rightly refused to extend *Squire* to income derived from

land that is not allotted to an American Indian taxpayer.[13] The specific tax

exemption created by the Supreme Court's interpretation of the General Allotment

Act "was to provide the allottee with unencumbered land when he became

---

[12] This is especially so where Congress has historically treated American Indian nations themselves—through their governing entities—differently from individual members of those nations. *Compare, e.g.*, *Uniband, Inc. v. Comm'r*, 140 T.C. 230, 241, 245 (2013) ("[F]ederally recognized Indian tribes are not subject to Federal income tax" because "Congress has never imposed the Federal income tax on Indian tribes.") *with Federal Power Comm'n*, 362 U.S. at 116 ("[I]t is now well settled by many decisions of [the Supreme] Court that a general statute in terms applying to all persons includes Indians and their property interests.").

[13] *See, e.g.*, *Anderson*, 625 F.2d at 914–15 (finding the General Allotment Act did not exempt from income taxes income derived by Sioux member of Fort Peck Tribes from cattle ranching on tribal land "under land-use program licenses"); *Fry v. United States*, 557 F.2d 646, 648–50 (9th Cir. 1977) (finding income derived by taxpayers, who were members of the Confederated Tribes of the Colville Reservation, from logging operations on reservation land was not exempt from federal income taxes even if the income derived by the Tribe from the same logging operation was tax exempt); *Holt*, 364 F.2d at 41–42 (finding no income tax exemption for taxpayer, a member of the Cheyenne River Sioux, who derived income from cattle and grazing operation on tribal land pursuant to a lease granted by the tribe because tax was neither an encumbrance upon tribal land, nor did retention of title to the land and cattle by the tribe create a trust relationship).

30

competent,"[14] "not to benefit him simply because he was an [American] Indian."

*Anderson*, 625 F.2d at 914 (internal quotation marks omitted). Furthermore, if

income derived from allotted land was taxable, and the tax was not paid, the

resulting tax lien would "make it impossible for [the American Indian taxpayer]

to receive the land free of [e]ncumbrance at the end of the trust period." *Id.*

(internal citations omitted).

The logic of *Squire* does not extend to exempt from taxation income derived

from land reserved to the Seneca Nation by the Treaty of Canandaigua. To the

extent dicta in *Lazore* and *Hoptowit* suggests otherwise, we disagree. The Seneca

Nation's land was never subject to the General Allotment Act, and even though

individual members of the Nation may obtain possessory interests in the land, the

Nation otherwise retains the land in fee simple. Like the petitioners in *Holt* and

*Anderson*, the Perkinses extracted gravel from the land pursuant to a license

granted by the Seneca Nation; they were neither allotted that land by the Nation

nor by congressional act. The land was not held in trust for their benefit, and

---

[14] "Competence" in this context refers only to an American Indian's ability to alienate the land allotted to him or her without the United States' permission. *See Anderson*, 625 F.2d at 913 n.2.

31

therefore the exemption from *Squire* has no application to their petition. Furthermore, taxing the income that individual members derive from extracting natural resources from Seneca land will not interfere with the Seneca Nation's "free use and enjoyment" of that land: unpaid taxes will not create a lien or encumbrance on the land—only on the income and chattel of the individual members engaged in extraction.

The Perkinses further argue that the Treaty of Canandaigua's promise of "free use and enjoyment" to the Seneca Nation itself extends to the Nation's "Indian friends," a term which they assert includes Alice as a member of the Seneca Nation. We disagree. That term is better understood as referring to the affiliated nations making up the Six Nations, including the Onondagas and Cayugas. The Supreme Court has interpreted that term in other treaties with the Seneca to specifically refer to the Cayugas and Onondagas. *See, e.g.*, *Fellows v. Blacksmith*, 60 U.S. 366, 368 (1956) (discussing that the Treaty of Buffalo Creek set aside land west of Missouri as intended for the "[t]he Seneca tribe, including among them their friends, the Onondagas and Cayugas . . . ."); *see also* 1838 Treaty of Buffalo Creek, 7 Stat. 550, 553 (Jan. 15, 1838) ("It is agreed with the Senecas that they shall have for themselves and their friends, the Cayugas and Onondagas,

32

residing among them . . . .").  Nothing in the Treaty of Canandaigua suggests nearly identical language should be viewed differently.

To the contrary, the context and negotiations surrounding the Treaty of Canandaigua demonstrates that "Indian friends" refers to the nations affiliated with the Senecas.  The Senecas and their allies (their "friends") presented a military threat to the United States that the federal government sought to neutralize through treaty.  And if there were any doubt, that language is not used in Article VII, wherein the United States and the Six Nations specifically address actions by "individuals on either side."  7 Stat. at 46, Art. VII.  Article VII does not use the term "Indian friends" or "their friends" to refer to individual members of the Seneca Nation or of any of the other Six Nations.

Finally, in an effort to construe "free use and enjoyment" as providing textual support for an exemption from taxes, the Perkinses argue that the Treaty of Canandaigua must be read *in pari materia*, or construed together, with the 1842 Treaty with the Seneca, which contains an explicit textual exemption from taxation that we discuss in detail below.  *See* Pet'rs' Br. at 21–25.  We disagree that the two treaties must be construed together.  The Treaty with the Seneca was concluded in large part to remedy a specific grievance related to state taxes and liens placed

upon Seneca land.  In contrast, the language "free use and enjoyment" in the Treaty of Canandaigua is better understood as restoring to the Seneca Nation autonomy and control over specific lands that were ceded in the treaties of Fort Stanwix and Fort Harmar.

We therefore reject the Perkinses argument that any guarantee of "free use and enjoyment" in the Treaty of Canandaigua exempts their gravel-mining income from federal income taxation.  Because the Treaty of Canandaigua contains no textual support for an individual exemption from federal income taxation, we need not proceed to interpret the treaty liberally.

## IV.   The 1842 Treaty with the Seneca

### A. Historical Background

The Treaty with the Seneca has a more convoluted history than the Treaty of Canandaigua.  In 1786, Massachusetts settled a dispute over territory with New York by purchasing rights of pre-emption over lands in Western New York that included the Allegany, Cattaraugus, Buffalo Creek, and Tonawanda territories of the Seneca Nation. *See, e.g.*, *In re New York Indians*, 72 U.S. 761, 761–62 (1866).  This meant that Massachusetts had exchanged claims over much of what is now Western New York for the right to purchase that land from the Haudenosaunee

34

should they ever choose to sell it. *See id.* at 762–63. Massachusetts eventually sold those pre-emption rights, and by 1838 they became vested with two private businessmen: Thomas Ogden and Joseph Fellows. *See id.*

In 1838, Ogden and Fellows purchased all of the Seneca Nation's land in New York, including the Buffalo Creek, Cattaraugus, Allegany, and Tonawanda territories for $202,000. With this purchase, the Seneca Nation entered into the 1838 Treaty of Buffalo Creek, 7 Stat. 550 (Jan. 15, 1838). The Treaty of Buffalo Creek contemplated that the Senecas would relocate west of the Mississippi within five years, that the federal government would hold part of the purchase price in trust for the Nation, and that half of the purchase price would be paid severally to individual members of the Seneca Nation for improvements on the purchased land.[15] *See* 7 Stat. at 551–53. Ogden and Fellows would not have a possessory right over the land until 1845. *See, e.g., New York Indians*, 72 U.S. at 763.

In 1840 the legislature of the State of New York passed an act assessing a highway tax on the Allegany and Cattaraugus territories. *See id.* In 1841, the

---

[15] The attempted removal of the Haudenosaunee to the West has a complex history that is not strictly relevant to this appeal. *See generally* Felix S. Cohen, HANDBOOK OF FEDERAL INDIAN LAW 420 (1942). In summary, while members of certain Haudenosaunee nations did relocate to Wisconsin and Kansas, the Seneca Nation in particular resisted resettlement and instead opted to remain in Western New York. *See id.*

legislature passed another act that authorized county assessors to assess taxes and survey for roads on land in the Allegany, Cattaraugus, and Buffalo Creek territories. *See id.* at 763–64. Under those two acts, county supervisors assessed taxes on land that was part of the Cattaraugus territory—land still occupied by the Seneca Nation, and not yet vested to Ogden and Fellows. *See id.* at 764. When those taxes went unpaid, the state imposed liens upon the assessed land and seized that land which, under the Treaty of Buffalo Creek, the Senecas had a right to occupy until 1845. *See id.* at 764–65. From 1840 to 1843, portions of the Cattaraugus territory were sold for unpaid taxes, despite the fact that the Seneca Nation continued to occupy the land. *Id.* The Supreme Court eventually invalidated those taxes under the Treaty of Buffalo Creek and the Treaty with the Seneca, *see New York Indians*, 74 U.S. at 767–72 (finding the taxes imposed on land occupied by the American Indian nations at issue were invalid until after the Senecas had vacated the land), but there were other disagreements between Ogden, Fellows, and the Seneca Nation arising from the Treaty of Buffalo Creek, *see, e.g., Fellows*, 60 U.S. at 367–72.

For example, although the Treaty of Buffalo Creek contemplated that the Haudenosaunee would relocate West of the Mississippi within five years, there

36

were no provisions outlining any method of removal. *See, e.g.*, *Fellows*, 60 U.S. at 366. Even after the later 1842 Treaty with the Seneca, the Supreme Court entertained an action for trespass brought by a member of the Tonawanda band of the Seneca Nation against Fellows and several other men who had taken possession of his timber mill through force of arms. *See generally Fellows*, 60 U.S. at 367–73. Furthermore, certain members of the Seneca Nation disputed the validity of the deed granting land to Ogden and Fellows on the grounds that it was not signed by a majority of the chiefs of the Seneca Nation, and alleging that bribes and fraud were used to secure signatures to the deed. *See* Felix S. Cohen, HANDBOOK OF FEDERAL INDIAN LAW 420 (1942).

### 1.  The 1842 Treaty with the Seneca

The United States concluded the 1842 Treaty with the Seneca in an effort to resolve disagreements stemming from the Treaty of Buffalo Creek, including restoration of Seneca ownership over the Allegany and Cattaraugus territories. *See* 1842 Treaty with the Seneca, 7 Stat. 586 (May 20, 1842). The preamble of the Treaty with the Seneca is specific: it recites the history of the Treaty of Buffalo Creek, including Ogden and Fellows's purchase of Seneca land, and states that all parties to the treaty "have mutually agreed to settle, compromise and finally terminate all

37

such [diverse] questions and differences on the terms" of the Treaty of Buffalo Creek. 7 Stat. at 587.[16]

Article IX of the Treaty with the Seneca states:

> The parties to this compact mutually agree to solicit the influence of the Government of the United States to protect such of the lands of the Seneca Indians, within the State of New York, as may from time to time remain in their possession from all taxes, and assessments for roads, highways, or any other purpose until such lands shall be sold and conveyed by the said Indians, and the possession thereof shall have been relinquished by them.

7 Stat. at 590.

### B. The Text of the 1842 Treaty with the Seneca Does Not Support an Exemption to Federal Income Taxation

Because the Treaty with the Seneca clearly contains textual support for an exemption from taxes of some kind, this Court must construe the treaty liberally, interpreting it as the Seneca would have understood it, and analyzing the language employed in light of its historical background. *See Mille Lacs Band of Chippewa Indians*, 526 U.S. at 196; *Choctaw Nation of Indians*, 318 U.S. at 432 ("[T]reaties cannot

---

[16] The Treaty with the Seneca also provided for payments to individual members of the Seneca Nation for improvements made on land within the Buffalo Creek and Tonawanda territories that Ogden and Fellows had purchased. *See id.* at Arts. III–VI, 7 Stat. at 588–89. Furthermore, if the Senecas relocated West of the Mississippi, any individual members of the Nation owning improvements on the Cattaraugus or Allegany territories would be paid for the value of such improvements when sold. *Id.* at Art. VI.

be re-written or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties."); *Seneca Nation of Indians*, 382 F.3d at 259. However, even construing the Treaty with the Seneca liberally, we find insufficient textual and historical support to read into the treaty an exemption for individual members of the Seneca Nation for taxes on income derived from Seneca land.

Article IX exempts "the lands of the Seneca Indians" "from all taxes, and assessments for roads, highways, or any other purpose until such lands be sold and conveyed" by the Seneca. 7 Stat. at 590. The Treaty neither addresses taxing the income of individual members of the Nation, nor does it address income that derives from "the lands of the Seneca." And while we are bound to interpret ambiguities liberally in favor of the Perkinses, we cannot rewrite the Treaty with the Seneca or expand it beyond its terms to cover individual federal income taxation. *See Choctaw Nation of Indians*, 318 U.S. at 432. Similarly, interpreting the treaty as the Seneca would have understood it does not counsel finding an exemption covering the Perkinses' gravel-mining income.

Only by reading the specific words "to protect such of the lands of the Seneca . . . from all taxes" in isolation is it possible to ignore that Article IX as a

whole was intended to prevent the imposition of specific taxes imposed by the State of New York on land belonging to the Nation. *See New York Indians*, 72 U.S. at 763–64. As a result, Article IX of the Treaty with the Seneca cannot be construed to create an exemption to income taxes on income earned from land owned by the Seneca Nation. *See, e.g.*, *Choctaw Nation of Indians*, 318 U.S. at 432 (finding that, absent evidence of understanding warranting departure from plain language of agreement it "must be interpreted according to its unambiguous language"); *Mescalero Apache Tribe*, 411 U.S. at 156 ("[A]bsent clear statutory guidance, courts ordinarily will not imply tax exemptions and will not exempt off-reservation income from tax simply because the land from which it is derived, or its other source, is itself exempt from tax.");[17] *Ramsey*, 302 F.3d at 1078.

None of the cases specifically interpreting the Treaty with the Seneca suggest otherwise. For example, *New York Indians* invalidated New York State's tax assessments on Seneca land, which implicated the very purpose and language

---

[17] While *Mescalero* interprets a federal statute rather than a treaty, there is no reason to think that a different rule would apply when doing so would create a hodge-podge of laws that tax individual citizens differently. We also reject the Perkinses' scattershot of arguments that claim any exemptions available to the Seneca Nation must also inure to the benefit of its individual members, *see, e.g.*, Pet'rs' Br. 33–34; Pet'rs' Reply Br. 22–24, because, as noted above, American Indian nations are treated differently from individual members, *see supra* n.12.

of the Treaty with the Seneca. *See* 72 U.S. at 769–72. Furthermore, contrary to the Perkinses' argument, *Fellows v. Blacksmith*, 60 U.S. 366 (1856), is inapposite. *Fellows* permitted a member of the Tonawanda band of the Seneca Nation to sue Joseph Fellows and other individuals for trespass after they sought to forcibly dispossess him of his land in Genesee County. *See id.* at 366–69. An individual right to an exemption from federal income taxes does not reason from a legal conclusion affirming a possessory interest in land. Nor did the Supreme Court discuss or interpret Article IX—even though it recited and discussed several of the other articles of the Treaty with the Seneca. *See generally id.*

In *United States v. Kaid*, 241 F. App'x 747 (2d Cir. 2007) (summary order), this Court rejected arguments that the Treaty with the Seneca prohibited taxation of cigarette sales made on reservations to non-American Indians, because "the treaty . . . clearly prohibit[s] only the taxation of real property, not chattels like cigarettes." *Id.* at 750–51 (citing *Snyder v. Wetzler*, 193 A.D.2d 329, 330–32 (3d Dep't 1993) (finding Article IX of the Treaty with the Seneca "refers only to taxes levied upon real property or land" in light of the history behind the treaty), *aff'd*, 84 N.Y.2d 941 (1994)). The Perkinses are correct that *Kaid* is not binding on this panel; and their argument is supported by the fact that *Kaid* and other state court

41

decisions interpreting the Treaty with the Seneca deal with excise taxes on goods rather than income "derived" from Seneca land. We nevertheless agree with our colleagues' reasoning in *Kaid*, and we refuse to read the Treaty with the Seneca so expansively as to apply to income taxes where that income was derived from the sale of gravel on Seneca land. Doing so would contort the plain language of an otherwise unambiguous treaty. We decline to expand the treaty without any support in the historical record for doing so. *See, e.g.*, *Five Civilized Tribes*, 295 U.S. at 420; *Mescalero*, 411 U.S. at 156; *Ramsey*, 302 F.3d at 1079.

### C. That the Perkinses' Income Derives from Seneca Land Does Not Compel a Different Result.

Although we find the tax exemption contained in Article IX is limited to Seneca land,[18] we must determine whether an exemption from taxes on land must extend to the Perkinses' gravel-mining income since their income "derives" from Seneca land. It does not. There are good reasons to treat income earned on the sale of gravel extracted from Seneca land differently than the real property itself.

---

[18] We only address the scope of the tax exemption appearing in Article IX of the Treaty with the Seneca to the extent necessary to determine the Perkinses' appeal. We need not determine whether that exemption is limited to state—as opposed to federal—taxation.

First, there is a meaningful difference between taxing income derived from land allotted to individual American Indians under the General Allotment Act and income derived from land belonging to an American Indian nation. Taxes levied upon real property may lead to tax liens and dispossession from that real property, whereas taxing *income* earned from selling natural resources—such as timber or gravel—does not present the same concern. This is especially so where, as here, the land is not owned by the taxpayer.

Second, ownership of mineral rights, including for the mining of gravel and sand, are routinely separated from ownership of real property. Many states—including New York—have historically taxed mineral and subsurface rights separately from real property itself. *See, e.g.*, *Smith v. Mayor of New York*, 68 N.Y. 552, 555 (1877) ("[O]ne may be taxed as owner of the fee of land, and another for the trees, buildings and other structures thereon, and the minerals and quarries therein."). To the extent natural resources such as gravel or timber can be harvested and then sold, it is obvious that those items are severable from, and can be taxed separately from, the land itself. Article IX of the Treaty with the Seneca was aimed at preventing the State of New York from taxing land belonging to the Seneca Nation, not the sale of resources derived from that land.

43

Finally, the Seneca Nation treats ownership of the land, possessory interests in land, and the right to extract gravel and other resources from its land differently. *See, e.g.*, J.A. 98–102 §§ 102(C), (F), (R), (U), 302. The Nation itself holds the land in the Allegany and Cattaraugus territories in fee simple, and it grants to individual members possessory interests in plots of land. *See* J.A. 100 § 102(R); *see also* Statement of Undisputed Facts, *Perkins v. United States*, No. 16-cv-00495 Dkt. 72-1 at ¶ 8 (W.D.N.Y.). The Nation may then permit members or non-members to extract gravel from land belonging to the Nation. *See* J.A. 102 § 302.

Because a property interest in a permit to extract gravel from certain land is different from possession of the land in fee simple, it is logical that one rule would apply to taxation of the surface or subsurface of the land and another would apply to the product of mining from a permit to that land. This is especially true in light of the historical context underpinning the Treaty with the Seneca.

We find neither textual nor contextual support for extending the tax exemption contained in Article IX to income derived by individuals from Seneca land.

## CONCLUSION

We **AFFIRM** the judgment of the tax court and remand for further proceedings consistent with this opinion.